[Cite as *In re C.T.*, 2018-Ohio-3823.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

In re C.T.

Court of Appeals No. S-18-005

Trial Court No. 21730237

**DECISION AND JUDGMENT**

Decided: September 21, 2018

* * * * *

Sarah A. Nation, for appellant.

Dean E. Ross, for appellee.

* * * * *

**MAYLE, P.J.**

{¶ 1} Appellant, B.F. ("mother"), appeals the January 31, 2018 judgment of the Sandusky County Court of Common Pleas, Juvenile Division, that adjudicated her child, C.T. ("child"), neglected and dependent, awarded temporary custody of child to A.F. ("aunt"), child's maternal aunt, and granted appellee, Sandusky County Job and Family

Services ("JFS"), protective supervision over child.[1]  For the following reasons, we affirm.

## I.  Background and Facts

{¶ 2} On September 8, 2017, mother overdosed on heroin while at her home.  JFS received a report about mother's overdose and initiated an investigation even though child was not home when mother overdosed.  Two JFS investigators interviewed mother after her discharge from the hospital that day.  Following that interview, mother signed a safety plan that placed child with aunt.

{¶ 3} On November 2, 2017, JFS filed a complaint alleging that child was neglected pursuant to R.C. 2151.03(A)(2) and (6) and dependent pursuant to R.C. 2151.04(C).  JFS based the allegations on mother's overdose, her subsequent drug use, and her refusal to provide JFS with releases that would allow the agency to discuss her medicines with her doctors and follow the progress of her drug and alcohol counseling.

{¶ 4} On December 1, 2017, the trial court held the initial hearing on the complaint.  JFS and mother stipulated to the reasons that the agency removed child from the home and agreed that JFS had made reasonable efforts to prevent the removal of child from the home.  Mother also consented to a finding of probable cause that the removal of child from the home should continue.

---

[1] Child's father is not a party to this case.

2.

{¶ 5} The adjudicatory hearing was scheduled for January 2, 2018. At the hearing, mother moved to have JFS's attorney recuse herself; JFS's attorney agreed to the recusal, and the trial court granted a continuance to allow JFS to prepare another attorney from the agency to handle the case. The court also addressed a discovery issue and ordered the parties to provide all discovery and file any motions by January 9, 2018. Prior to adjourning, the trial court addressed an earlier representation by mother's attorney that mother might be willing to combine the adjudicatory and dispositional hearings. After consulting with mother, her attorney indicated that mother's preference was "to combine the Adjudication and the Disposition, put them together * * *." None of the other parties objected to combining the hearings. The court then stated that it would "grant mother's request to combine—to waive any notices and combine the Adjudication and Disposition * * *." The trial court also stated in its judgment entry on the January 2 hearing that the adjudicatory and dispositional hearings would be combined "as allowed by ORC §2151.353 [sic]." In addition to the judgment entry, the court sent a notice of "Combined Adjudicatory and Dispositional Hearing" dated January 2, 2018, to all parties and their attorneys.

{¶ 6} On January 29, 2018, the trial court held the combined adjudicatory and dispositional hearings. Prior to hearing testimony, the court addressed a motion that child's maternal grandmother, P.B.-F. ("grandmother"), filed on January 23, 2018, asking to "put [her] back on case." The gist of grandmother's motion was that she wanted visitation with and custody of child. The court added grandmother as a party to the case

3.

over the agency's and the guardian ad litem's objections. Notably, mother did not object to grandmother being made a party and participating in the case. Her attorney specifically stated that "[w]e do not object to [grandmother] being a party to this case." Grandmother, who appeared pro se, asked questions of the witnesses and participated in the proceedings along with the other parties.

{¶ 7} During the adjudicatory hearing, JFS, mother, and grandmother each presented witnesses. The following facts were developed at the hearing.

{¶ 8} On the morning of September 8, 2018, mother overdosed on heroin at her home. Mother believed that the drug she was snorting was fentanyl, but later learned that the fentanyl was laced with heroin. She also said that she received eight doses of Narcan to revive her and save her life.

{¶ 9} JFS received a referral regarding mother's overdose even though child was not at home at the time. Mother works a midnight shift, so child was at a babysitter's home that morning. Mother left child with the babysitter whenever she worked and would usually pick up child in the morning and take him to school. One of the police officers who responded to mother's house contacted the babysitter, who told the officer that she would take child to school and could keep child longer, if necessary. JFS contacted aunt, who agreed to pick up child from school and allow him to reside with her temporarily. Although mother was unable to make arrangements for child, she said that child "would have gotten taken care of somehow or another," regardless of JFS involvement on September 8.

4.

{¶ 10} Two JFS investigators, Samantha Reamer and Halle Rice, spoke to mother after her release from the hospital on September 8. They spoke to mother the same day as her overdose because the agency considered the situation emergent and needed to take immediate action. Mother was lethargic and had trouble concentrating, but Reamer believed that mother understood what was happening. Mother also read and agreed to sign a safety plan placing child with aunt and requiring mother's visits with child to be supervised. Reamer testified that the safety plan was put into place because of "drug use in the home." Mother claimed that she was unaware of the full ramifications of signing the safety plan and that she only signed it because the investigators threatened to put child in foster care if she did not.

{¶ 11} To facilitate reunification with child, mother agreed to seek alcohol and drug treatment services, submit to drug screens, and work with a case manager at Treatment Alternatives to Street Crime ("TASC"). Mother would not, however, sign releases of information to allow JFS to contact her providers for updates on her progress. Mother provided a release to TASC that allowed it to provide information to JFS, so JFS received mother's drug test results. JFS could not, however, contact TASC to discuss the results because mother would not sign a release allowing JFS to speak to TASC. Mother completed a drug and alcohol assessment and attended eight counseling sessions, which she finished the week before the hearings.

{¶ 12} Despite completing drug and alcohol counseling, mother's drugs screens were consistently positive for oxycodone, amphetamine, and benzodiazepine.

5.

Additionally, mother tested positive for cocaine twice—the second time only nine days before the hearings—and alcohol once.

{¶ 13} According to Cassidy Guzman, mother's case manager at TASC, the list of prescription medicines that mother provided to Guzman included medicines that could explain the positive results for oxycodone, amphetamine, and benzodiazepine. Some of the prescriptions were outdated and mother refused to sign releases of information to allow Guzman to confirm all of the prescriptions. Guzman was able to speak to two of mother's doctors, however; one stopped prescribing an amphetamine after learning of mother's overdose and one told Guzman that mother tested positive for cocaine while she was a patient, so mother should not be prescribed any narcotics, including oxycodone. Guzman also said that the amounts of drugs in mother's urine—particularly amphetamine—were elevated, leading Guzman to conclude that mother was abusing her prescription medicines. Even though JFS did not know exactly what medicines mother was prescribed, Reamer also concluded based on the drug test results that mother was abusing her prescription drugs. Mother denied abusing her medicines. She said that she was treating with new doctors, receiving her prescriptions from them, and taking her medicine as prescribed.

{¶ 14} On October 4, 2017, JFS held a family team meeting to address a conflict that had arisen between mother and aunt. Meagan Myers, a supervisor at JFS, was at the meeting. She testified that mother suggested grandmother as an alternative placement for child, but the workers at the meeting brought up the agency's concerns with

6.

grandmother's alcohol use. Grandmother then became upset, began yelling, said "fuck all of you," told mother that she could "find somewhere else for [child] to go," and left the agency. After this, Myers called aunt, who agreed to keep child as long as visits were no longer held at her home.

{¶ 15} Shortly after grandmother left JFS, JFS received a call from child's school because grandmother was at the school demanding to see child and "causing a big scene." JFS sent mother and a caseworker to the school to pick up child and bring him back to the agency to wait for aunt to take him home.

{¶ 16} Between the time grandmother left and the school called, mother twice "began to nod off" while speaking to Myers and another JFS worker. Mother denied having trouble staying awake. At the hearing, she claimed that she was "in shock" because she needed to find a new placement for child. Myers suggested during the meeting that mother go to in-patient drug treatment, which mother refused, claiming that she was not a drug addict.

{¶ 17} Following the October 4 meeting, mother briefly had supervised visits with child at Village House. On October 24, 2017, Sue Fuller, the executive director of Village House, emailed Myers about mother's visits. In her email, Fuller said that mother's "behavior tonight raised some concern's [sic] which prompted me to ask [aunt] if she would be willing to allow me to make a copy of the safety plan to hopefully gain a better insight to the bigger picture." Fuller sent the email to let Myers know that Fuller changed the level of supervision for mother's visits based on the requirement in the safety

7.

plan that mother's visits be observed by "direct eye contact." Mother would not sign a release of information to allow Village House to provide JFS with information about her visits, however, so JFS was not able to learn the specifics of Fuller's concerns. Because it could not find out the details of the incident, JFS chose to move mother's visits to the agency.

{¶ 18} According to Fuller, during the October 24 visit mother "seemed to kind of detach a little bit from the visitation, lose concentration and somewhat just become distracted almost as if—as if she may have been nodding off * * *." She also said that mother would reengage with child when he talked to her. Fuller checked on mother because mother had mentioned at her orientation that she had some medical issues. Fuller asked mother "if she was okay, and she said that she was fine, she'd just had a rather challenging day and had just been running all day * * *." Fuller got mother a drink and snack, after which mother seemed to improve, although mother became distracted on "another occasion or two during the visit * * *." Mother also testified that she was not feeling well that evening because "my sugar went low and my Potassium," but that she was fine after having a piece of candy and some juice.

{¶ 19} Mother said that the visits at JFS were going "terrible." She complained that JFS required her to be at the agency 45 minutes before her scheduled visit time, agency workers would "badger" her while she was there, and she did not get her full visitation time with child. She claimed that the agency's restrictions on her visits were the result of her failure to attend the agency's Christmas party. She said that she was out

8.

of town at the time, and that she had received a call from someone telling her that aunt and child were also out of town and would not be at the party. Mother attempted to confirm with someone at the agency that child would not be at the party, but no one called her back, so she did not attend.

{¶ 20} In addition to the current case, JFS had prior involvement with mother and child. Reamer testified that the agency substantiated a domestic violence referral in May 2010 after father physically assaulted mother. This resulted in a no-contact order between child and father (who was in prison at the time of the hearings). In May 2017, the agency opened another investigation due to concerns that mother was using heroin, had left child outside alone, and had nodded off while driving, nearly causing an accident. The investigation did not result in a disposition because it was an alternative response investigation. JFS closed the investigation because mother obtained an attorney and then told JFS that it did not need to be involved with her because she had an attorney.

{¶ 21} On cross-examination, mother testified to an incident that happened shortly before the hearing where she blacked out while getting gas. She said that she was not using any drugs or alcohol at the time, and told the police officer who responded to the gas station that she has narcolepsy. She said that she still drives and that she has been cleared by her doctors to do so.

{¶ 22} Mother's refusal to sign releases of information was discussed extensively at the adjudicatory hearing. Mother testified that she initially signed releases to allow JFS to speak to her doctors, but that JFS only made one phone call after receiving the

9.

releases. Based on mother's perception of her treatment by JFS, mother said that she would not provide any other requested releases until Reamer, Rice, and Myers were no longer working on her case. Mother testified on direct that she signed the releases requested by the GAL and brought the releases requested by TASC to court that day. On cross-examination, however, mother testified that she would not provide TASC with the requested releases until Reamer, Rice, and Myers were off the case.

{¶ 23} Based on her investigation and her knowledge of the case, Reamer testified that mother had "not really" been cooperative with JFS's investigation. Reamer concluded that child lacked adequate parental care because of mother's faults or habits, child's environment was such that JFS's continued involvement with the family was necessary, and staying with aunt was in child's best interest.

{¶ 24} Following the presentation of the testimony and evidence, the court recessed to deliberate about the adjudication of JFS's neglect and dependency complaint. The court found that child was neglected because he lacked adequate parental care due to the faults or habits of mother and was dependent because his condition or environment was such that it warranted the state assuming guardianship of child in the interest of child.

{¶ 25} The court based its findings on mother overdosing and requiring lifesaving measures on September 8, 2017, which left her unable to ensure that child went to school that day or that he would be cared for after school. The court also found that mother was given the opportunity to work a safety plan to address her drug use, but had continued to

10.

test positive for drugs—including cocaine—and was unable to adequately explain the positive drug screens by providing current prescription information. Further, mother refused to acknowledge that she has a substance use problem. The court also noted that mother had not cooperated with JFS in getting treatment or allowing JFS to follow her treatment progress. Additionally, the court noted that mother had nodded off at JFS, Village House, and TASC, and while driving. Despite that, mother indicated that she drove child and intended to continue driving child.

{¶ 26} The court then proceeded to the dispositional hearing. During the hearing, JFS, mother, aunt, and the GAL each called witnesses. The court also considered testimony that Guzman, mother's case manager at TASC, gave at the adjudicatory hearing. The trial court expressly allowed Guzman to provide testimony during the adjudicatory hearing that would be used during the dispositional hearing. So although Guzman did not testify at the dispositional hearing, the court properly considered her testimony for disposition. The following facts were developed at the hearing.

{¶ 27} Gabrielle Henry, an ongoing caseworker for JFS, testified that the agency sought to reunify mother and child. To help mother achieve reunification, Henry drafted a case plan that included the requirements that mother: be clean and sober; have a clean and sober support system; comply with the instructions of her doctors and pain management program; establish healthy relationships with her family members; sign releases of information; follow all recommendations of her treatment providers; attend

11.

AA, NA, or CA meetings and provide proof of attendance; and attend, actively participate in, and successfully complete a drug and alcohol program.

{¶ 28} The substance abuse treatment elements of the case plan were included because, based on her conversations with mother, Henry believed that mother had an ongoing drug problem and would benefit from further drug treatment monitored by JFS. Henry gave mother a drug test on January 18, 2018, during the most recent visit between mother and child. The test came back positive for amphetamine and cocaine.

{¶ 29} Mother said that she was willing to comply with certain parts of the case plan that Henry drafted, including complying with information requests, taking drug tests, staying clean and sober, and following treatment recommendations. She was not willing to work on her family relationships or sign all requested releases of information, however. Mother vacillated on whether she was willing to sign any releases of information requested by JFS. Although she said several times that she would sign the releases "if it came down to it," she also said that she was unwilling to sign releases for JFS because "last time the lady messed it up" and there were some medical records that mother believed "don't pertain to" JFS. In fact, mother twice responded "no" when the trial court asked her directly if she would "follow the Case Plan" relative to the releases and "would sign all of the releases requested on behalf of the Children Service Agency."

{¶ 30} Henry said that mother was visiting with child at the agency, but that her behavior had been "inconsistent." That is, mother did not interact much with child at some visits, but did at others. According to observations that the agency documented

12.

during a visit on December 7, 2017, mother "acted and moved in slow motion" when the worker observing the visit got mother from the lobby. Other than this note, Henry did not see any concerns with the visit. At a visit on December 14, 2017, however, the worker observing the visit noted that mother sat on a chair or the couch for the whole visit and did not interact with child. Mother was also "very quiet and didn't have any expressions." Henry said that mother "was pretty much zoned out during the visit and in slow motion." Mother believed that she was "badgered" during visits at JFS and wanted visits with child moved back to Village House. She agreed that she would sign releases of information to allow JFS and the GAL to speak to staff at Village House about her case.

{¶ 31} At both the December 7 and 14 visits, JFS gave mother a flyer with information about the agency Christmas party on December 21. Mother did not attend the party. Henry spoke to mother on the phone about the Christmas party that morning, but did not remember the specifics of the conversation or whether she was supposed to have called mother back. When mother did not come to the party, Henry and a supervisor called mother and then went to mother's house, but they could not reach her. Henry then called aunt, who came to the party and spent time with child. Henry described child as "sad" until aunt arrived at the party. After that, his demeanor changed. Mother did not address the issue of the Christmas party during the dispositional hearing.

{¶ 32} Henry testified that she believed that it was in child's best interest to award temporary custody of him to aunt with JFS maintaining protective supervision. He was

13.

happy, healthy, and generally interacted well with the other children in aunt's home. Henry said that child's school performance had improved since being placed with aunt; he was having fewer angry outbursts, attending school regularly, and getting better grades. Aunt was also meeting all of child's needs, including taking him to all of his appointments, and there were no issues that might prevent child from continuing to reside in aunt's home. Additionally, Henry said that aunt's drug screens had all been negative. Aunt testified that she wanted to see mother and child reunified and was willing to care for child until mother could regain custody. She also said that she was willing to follow the case plan and any court orders related to child.

{¶ 33} The GAL agreed that giving aunt temporary custody was in child's best interest. He said that child was doing "wonderfully" in school and that child had made "major improvements." Child was also "flourishing" in his current environment and "getting the * * * safety and security that he needs in the home right now." The GAL wanted mother and child reunified when mother was capable of caring for child and noted that child said at every appointment that he wanted to live with mother. To facilitate reunification, the GAL recommended that mother visit child regularly and stay alert during visits, comply with case plan services and recommended service providers, and get and stay sober. Based on the testimony he heard at the hearings, the GAL said his only additional concern was about mother following the case plan.

{¶ 34} Regarding grandmother, Henry testified that she had concerns about placing child with grandmother, despite her limited interactions with grandmother.

14.

Primarily, Henry did not know what grandmother's motivation for seeking temporary custody of child was and did not know how child would respond to living with grandmother. Henry also had concerns about grandmother's anger, behavior, and willingness to cooperate with the agency's recommendations. She also believed that disrupting child's placement with aunt was not in his best interest because "moving a child for the sake of moving does not benefit the child. It sets him back, so, no, I wouldn't want to place him just for the sake of moving him when he is doing so well."

{¶ 35} The GAL also had reservations about placing child with grandmother. In his report, the GAL noted that there were allegations that grandmother had an alcohol addiction and that her home was not safe for children. His report also described an incident where police were called to child's school because grandmother was heard telling child to "'f**king kill them'" if anyone at home tried to hurt him. Additionally, the GAL overheard grandmother telling someone that she intended to move child to Tennessee if she received custody of him. Grandmother confirmed that she made the statement "'cause that's my plans." The GAL believed that moving child would be detrimental to child because child was doing well in school and doing well with aunt. The GAL did not "think moving him away from his family into another state would be helpful."

{¶ 36} After hearing the evidence at the dispositional hearing, the court again recessed to deliberate. The court determined that it was in child's best interest to grant aunt temporary custody with JFS maintaining protective supervision. The court also

adopted the case plan that JFS submitted into evidence; ordered that mother have visitation as determined by JFS, but no less than once a week; ordered that grandmother have supervised visitation as determined by JFS; and ordered that father continue to have no contact with child.

{¶ 37} The court based its decision on the reports that child was doing better in school since his placement with aunt, child had been integrated into aunt's family, aunt was addressing child's basic and medical needs, and child was generally doing "very, very well." The court found that mother tested positive for cocaine shortly before the hearings, was not as engaged in treatment as she should have been, and refused to acknowledge that she had a drug problem. Mother also "blames others for her lack of follow through on treatment or in providing information * * *" related to her medical care. Further, the court found that mother had been "uncooperative" and said that

> [m]other testified that she is unwilling to provide all of the information that has been—that has been and would be requested of Children Services under the Case Plan. That causes great concern for this Court, because I have concern about her ability to work towards reunification, if, in fact, she is not cooperative.

{¶ 38} As to grandmother, the court found that she intended to take child to Tennessee if she were awarded temporary custody, which would hamper mother's ability to work toward reunification and would take child away from his mother, whom he loves.

{¶ 39} The trial court's factual findings in its January 31, 2018 judgment entry mirror the findings that the court made on the record at the hearings. As to adjudication, the court found that mother overdosed, requiring lifesaving measures, which left her unable to care for or arrange for the care of child. When mother's doctors refused to prescribe narcotics after the overdose, mother found new doctors from whom to obtain prescriptions for narcotics. Mother continued to take narcotics and continued to test positive for elevated levels of prescription drugs, as well as test positive for cocaine and alcohol. The court also determined that mother was uncooperative with JFS and would not provide releases of information to allow JFS to follow her progress. Additionally, mother nodded off during visits, while driving, and while paying for gas, but did not provide any verification of her claimed narcolepsy. Mother testified that she intends to continue driving child. The trial court specifically found that mother's

> ongoing and habitual use of drugs has resulted in her inability to provide adequate parental care of the minor child and her inability to recognize her substance abuse and access treatment places the child at risk of potential harm. The current condition of the environment should the child be returned to Mother, is not appropriate for the minor child.

{¶ 40} Regarding disposition, the court found that child was doing well with aunt, was performing better in school, and had been integrated into aunt's family. It also found that mother continued to be uncooperative with JFS, continued to use street drugs, and was "not able to adequately and appropriately

provide for the minor child * * *."  Additionally, the court found that grandmother had told mother to find someone else to take care of child when grandmother became upset during a meeting with JFS and intended to move child to Tennessee if she were given custody.  Based on these facts, combined with the agency's and the GAL's recommendations that aunt receive temporary custody of child, the court found that placing child in the temporary custody of aunt was in child's best interest.

{¶ 41} Mother now appeals, raising three assignments of error:

     I.  THE TRIAL COURT ERRED IN FAILING TO BIFURCATE ADJUDICATION AND DISPOSITION.

     II.  THE TRIAL COURT ERRED IN PERMITTING MATERNAL GRANDMOTHER TO PARTICIPATE IN ADJUDICATION AND DISPOSITIONAL PROCEEDINGS.

     III.  THE TRIAL COURT ERRED IN ADJUDICATING C.T. AS A NEGLECTED AND DEPENDENT CHILD.

## II.  Law and Analysis

### A.  The Trial Court Properly Combined the Hearings

{¶ 42} In her first assignment of error, mother argues that the trial court erred by combining the adjudicatory and dispositional hearings because mother did not properly consent to combined hearings.  JFS counters that the trial court properly held the hearings

on the same day because mother waived her right to have them on separate days and received notice of the combined hearings. We agree with JFS.

{¶ 43} Dispositional hearings in abuse, neglect, and dependency cases are governed by Juv.R. 34 and R.C. 2151.35. Under Juv.R. 34(A), after a juvenile court adjudicates a child abused, neglected, or dependent, the court is required to hold "a separate dispositional hearing" before issuing a dispositional order. The court may hold the dispositional hearing "immediately after" the adjudicatory hearing if (1) "all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing" and (2) "all parties consent to the dispositional hearing being held immediately after the adjudicatory hearing." *Id.*

{¶ 44} Similarly, R.C. 2151.35(B)(1) requires the juvenile court to hold "a separate dispositional hearing" before issuing a dispositional order in an abuse, neglect, or dependency case and allows the court to hold the dispositional hearing "immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing." While R.C. 2151.35 does not require the parties' consent to immediately holding the dispositional hearing, it contains the additional requirement that the court give all parties and the GAL "notice of the adjudicatory and dispositional hearings in accordance with the Juvenile Rules." R.C. 2151.35(C).

{¶ 45} The fundamental requirement of due process is notice "reasonably calculated, under all the circumstances," to apprise interested parties of the pendency of

19.

the proceedings. *In re A.G.*, 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146, ¶ 64, quoting *Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S.Ct. 1187 14 L.Ed.2d 62 (1965), and *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "However, the Rules of Juvenile Procedure do not specify the manner in which the court must supply a party notice of an adjudicatory or a dispositional hearing." *In re J.M.B.*, 4th Dist. Ross No. 07CA2978, 2008-Ohio-1285, ¶ 16. Generally speaking, a party receives proper notice of a hearing when the notice is sent to her or her attorney pursuant to Juv.R. 20(A) and (B), which provide that "[w]ritten notices * * * be served upon each of the parties" and when "service is required or permitted to be made upon a party represented by an attorney, the service shall be made upon the attorney * * *." *See J.M.B.* at ¶ 17, citing *In re Keith Lee P.*, 6th Dist. Lucas No. L-03-1266, 2004-Ohio-1976, ¶ 8.

{¶ 46} Here, mother expressly consented to the combined hearings. On January 2, 2017, the trial court asked mother's attorney if mother wanted to combine the adjudicatory and dispositional hearings, and, after conferring with mother, her attorney said that mother's preference was "to combine the Adjudication and the Disposition, put them together * * *." Because mother chose to proceed with the dispositional hearing "immediately after" the adjudicatory hearing, she cannot assert the issue as error on appeal. *In re Rector*, 5th Dist. Tuscarawas No. 96AP100087, 1997 Ohio App LEXIS 3975 (Aug. 4, 1997). Further, although mother asserts that her waiver was ineffective because "[t]he question was directed to her attorney," the relevant rules and statute do not

20.

require the court to address the parties, personally, to obtain consent to combined hearings.

{¶ 47} Mother also complains that the trial court erred by finding that mother waived "any notices" of the combined hearings. But despite this finding, the court did, in fact, send a notice of "Combined Adjudicatory and Dispositional Hearing" to all parties and their attorneys, including mother and her attorney, on January 2, 2018. This complies with the notice requirements in the Rules of Juvenile Procedure and R.C. 2151.35(C). *See J.M.B.* at ¶ 17. Because mother consented to the combined hearings and received proper notice of the hearings, we find that her first assignment of error is not well-taken.

### B. Mother Waived any Objection to Grandmother Intervening

{¶ 48} In mother's second assignment of error, she argues that the trial court erred by allowing grandmother to intervene in the case and participate in the adjudicatory and dispositional hearings. Prior to the adjudicatory hearing, however, when the court asked the parties if they objected to either the lack of notice of grandmother's motion (which was filed six days before the hearing) or to grandmother being added as a party to the case, mother's attorney responded, "We do not object to her being a party to this case."

{¶ 49} A party's "failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Moreover, "a party will not be permitted to take advantage of an error that [she] invited or induced the trial court

21.

to make." *State ex rel. Beaver v. Konteh*, 83 Ohio St.3d 519, 521, 700 N.E.2d 1256 (1998).

{¶ 50} Here, mother expressly told the trial court that she did not object to grandmother being added to the case, so mother waived this issue on appeal. And even assuming that the trial court committed some error relating to grandmother's motion to intervene, mother invited the error by explicitly telling the court that she did not object to grandmother being made a party. Mother cannot not now "take advantage of an error that [she] invited or induced the trial court to make." *Beaver* at 521. Accordingly, we find that mother's second assignment of error is not well-taken.

## C. Competent and Credible Evidence Supports the Trial Court's Findings that JFS Proved Neglect and Dependency by Clear and Convincing Evidence

{¶ 51} In her third assignment of error, mother argues that the trial court's findings that child was neglected and dependent are not supported by the manifest weight of the evidence because child was not present when mother overdosed and there was no evidence that child was harmed by mother's overdose or drug use. JFS contends that the record contains competent, credible evidence that supports the trial court's findings of neglect and dependency.

{¶ 52} A trial court's adjudication of a child as abused, neglected, or dependent must be supported by clear and convincing evidence. R.C. 2151.35(A)(1); Juv.R. 29(E)(4). Proof by clear and convincing evidence requires that the evidence "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

22.

established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is a higher degree of proof than preponderance of the evidence, but a lower degree than beyond a reasonable doubt. *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211, ¶ 37 (6th Dist.).

{¶ 53} When an appellate court reviews a trial court's adjudication to determine whether the judgment is supported by clear and convincing evidence, the reviewing court must determine whether the trial court had before it evidence sufficient to satisfy the requisite degree of proof. *Id.* at ¶ 7. That is, we examine the record to determine whether the agency sustained its burden of producing clear and convincing evidence of dependency or neglect as defined by R.C. 2151.03 and 2151.04. An appellate court will not reverse a trial court's adjudication where competent and credible evidence supports the findings of fact and conclusions of law. *Id.*

{¶ 54} In this case, the trial court found that JFS proved two of the allegations of neglect and dependency in its complaint.[2] The court relied on (1) mother's overdose on heroin, which left her hospitalized and unable to ensure that her seven-year-old child got

---

[2] We note that the trial court did not specify the statutory subsections under which it found that the child was neglected and dependent. Nevertheless, because the judgment entry mirrors the language of neglect under R.C. 2151.03(A)(2) and dependency under R.C. 2151.04(C), but does not include language consistent with neglect under R.C. 2151.03(A)(6), we determine that the trial court found clear and convincing evidence to support the allegations of neglect under R.C. 2151.03(A)(2) and dependency under R.C. 2151.04(C), but not neglect under R.C. 2151.03(A)(6).

23.

to school or had someone to care for him after school; (2) mother's positive drug screens, including tests that were positive for cocaine; (3) mother's unwillingness to give JFS access to her treatment providers so that the agency could verify mother's prescriptions and treatment progress; (4) mother finding new doctors so she could obtain medicines that her former doctors refused to prescribe after her overdose; (5) mother "nodding off" at JFS and Village House, while driving, and while attempting to pay for gas; and (6) mother's testimony that she has narcolepsy (which was not verified by medical providers or records), but intends to continue driving the child. The court concluded that:

> Mother Continues [sic] to engage in a pattern of behavior that prevents her from adequately providing for and meeting the needs of her 7 year old [sic] child. Her ongoing and habitual use of drugs has resulted in her inability to provide adequate parental care of the minor child and her inability to recognize her substance abuse and access treatment places the child at risk of potential harm. The current condition of the environment should the child be returned to Mother, is not appropriate for the minor child.

{¶ 55} After carefully reviewing the record, we find that JFS proved neglect and dependency by clear and convincing evidence, and that the trial court's findings of neglect and dependency are supported by competent and credible evidence.

### 1. Neglect

{¶ 56} As relevant here, a "neglected child" is a child "[w]ho lacks adequate parental care because of the faults or habits of the child's parents * * *." R.C.

2151.03(A)(2). "Adequate parental care" means that the parent provides "adequate food, clothing, and shelter to ensure the child's health and physical safety and * * * specialized services warranted by the child's physical or mental needs." R.C. 2151.011(B)(1).

{¶ 57} A finding of neglect requires proof "'that the parents were willfully at fault in abandoning or neglecting the children or refusing to perform their parental duties' * * *." *Alexander C.* at ¶ 45, quoting *In re Bibb*, 70 Ohio App.2d 117, 120, 435 N.E.2d 96 (1st Dist.1980). A parent's drug use and refusal to cooperate with case plan services is sufficient "fault" to support a finding of neglect under R.C. 2151.03(A)(2), even if the child has adequate food, clothing, and shelter. *See, e.g., In re L.C.*, 10th Dist. Franklin Nos. 12AP-1057 and 12AP-1059, 2013-Ohio-2564 (upholding finding of neglect despite testimony that the children always had food, clothing, shelter, and supervision because mother was not complying with treatment program, continued to test positive for illegal substances, and refused to give agency access to her treatment providers, and agency had received reports that mother "appeared intoxicated or on a drug").

{¶ 58} The evidence presented at the hearing showed that mother overdosed on heroin (that she thought was fentanyl), which prevented her from ensuring that child would be taken to school and cared for after school. She used prescription drugs that she refused to verify for JFS or TASC and used cocaine, which led to positive drug screens even while she was participating in drug counseling. Mother also nodded off at inappropriate times and in inappropriate places—including while driving and in front of child—but did not provide JFS or the trial court with any information from her medical

25.

providers to verify her claimed diagnosis of narcolepsy. And mother refused to cooperate with JFS so that it could monitor her progress.

{¶ 59} The facts of this case are similar to those in *L.C.* There, the Tenth District Court of Appeals upheld the trial court's finding of neglect under R.C. 2151.03(A)(2) even though the children services agency presented "little direct evidence of the children's condition." *Id.* at ¶ 18. We agree with the Tenth District's conclusion that

> [a]lthough the evidence in this case borders on the line of clear and convincing evidence of neglect, our standard of review in these cases is to determine whether there was competent credible evidence to support the trial court's determination. The trial court found appellant's faults and habits would prevent her from meeting the needs of her children, and there was no evidence appellant had undertaken appropriate actions to remedy these faults and habits. Therefore, we conclude that the court had clear and convincing evidence before it to find the children were neglected. *Id.*

Therefore, we find that JFS presented clear and convincing evidence that child was a neglected child under R.C. 2151.03(A)(2), and that the trial court's finding of neglect was supported by competent and credible evidence.

## 2. Dependency

{¶ 60} In contrast to a neglected child, a dependent child, as relevant here, is a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(C). A finding of

26.

dependency "requires no showing of fault, but focuses exclusively on the child's situation * * *." *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227 (1997). A trial court may only consider a parent's conduct as far as the conduct forms part of the child's environment. *In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 74. Further, the parent's conduct is significant only if the conduct has an adverse impact on the child sufficient to warrant state intervention. *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). A dependency finding based on a parent's use of illegal substances or abuse of legal substances "requires 'some evidence that [the parent's] supervision of her children or the environment of her children has been affected in some negative way' by the behavior of the parent." *In re O.H.*, 9th Dist. Summit No. 25761, 2011-Ohio-5632, ¶ 9, quoting *In re R.S.*, 9th Dist. Summit No. 21177, 2003-Ohio-1594, ¶ 20.

{¶ 61} In determining that child was dependent, the trial court found that mother's overdose, drug use, and failure to address her substance use issues prevented her from ensuring that child was adequately cared for, which created an environment that was "not appropriate for the minor child." Mother's inability to care for child when she overdosed is "some evidence" that mother's supervision of child was negatively affected by mother's behavior and drug use, which is sufficient to support a finding of dependency under R.C. 2151.04(C) based on substance use. *O.H.* at ¶ 9. Accordingly, we find that JFS presented clear and convincing evidence that child was a dependent child under R.C. 2151.04(C), and that the trial court's finding of dependency was supported by competent and credible evidence. Mother's third assignment of error is not well-taken.

27.

### III. Conclusion

{¶ 62} Based on the foregoing, the January 31, 2018 judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                              _____
                                                 JUDGE

James D. Jensen, J.

                                                 _____

Christine E. Mayle, P.J.                                      JUDGE
CONCUR.

                                                 _____
                                                 JUDGE