[Cite as *In re K.J.*, 2020-Ohio-3918.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:

    K.J.,

CASE NO. 5-19-31

ALLEGED NEGLECTED AND
DEPENDENT CHILD.

**O P I N I O N**

[NATALIE GRILLIOT - APPELLANT]

IN RE:

    M.C.,

CASE NO. 5-19-32

ALLEGED NEGLECTED AND
DEPENDENT CHILD.

**O P I N I O N**

[NATALIE GRILLIOT - APPELLANT]

**Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court Nos. 20193042 and 20193043**

**Judgments Reversed**

**Date of Decision:  August 3, 2020**

**APPEARANCES:**

    *Dorothy L. Williams* **for Appellant**

    *Wesley R. True* **for Appellee**

**WILLAMOWSKI, J.**

{**¶1**} Appellant Natalie Grilliot ("Grilliot") brings this appeal from the judgments of the Court of Common Pleas of Hancock County, Juvenile Division finding that the children, K.J. and M.C. were neglected and dependent children and placing the children in the temporary custody of Natalie Boggs (Boggs) with protective supervision by the Hancock County Job and Family Services – Children's Protective Services Unit ("the Agency"). Grilliot claims that the trial court erred in determining that the children were neglected and dependent and that the trial court erred in removing the children from the home. For the reasons set forth below, the judgments are reversed.

{**¶2**} Grilliot is the mother of K.J. (born in 2008) and M.C. (born in 2017). ADoc. 1 and BDoc. 1.[1] On April 11, 2019, the Agency received a report claiming that the children were not being properly cared for, that Grilliot was using methamphetamine in the home and leaving chunks of meth on the floor where M.C. was crawling. *Id*. The report also alleged that there was no food in the home because Grilliot was selling her food stamps to buy drugs, that M.C.'s diaper was not being changed, and she was not being fed or bathed regularly. *Id*. An investigator went to the home on April 12, 2019, and observed M.C., who appeared happy and healthy at that time, though K.J. was at school at the time. *Id*. Grilliot

---

[1] K.J.'s case is identified as ADoc. M.C.'s case is identified as BDoc.

and Jesse Bibler ("Bibler"), her boyfriend, admitted to using marijuana and agreed to submit to drug screens. *Id*. On April 17, 2019, the agency received the results of the drug screens which showed that both Grilliot and Bibler tested positive for THC, methamphetamines, and amphetamines. *Id*. At that time, the Agency moved the children to Boggs' home pursuant to a previously determined safety plan. On May 8, 2019, the Agency filed complaints alleging that K.J. and M.C. were neglected and dependent children. *Id*. The basis for the complaints were the positive drug screens of Grilliot and Bibler. *Id*. The complaints also noted that Gilliot had been diagnosed with multiple mental health disorders. *Id*. The Agency requested that the children be removed from the home and placed in the temporary custody of their maternal grandmother, Boggs, under the protective supervision of the Agency. *Id*. A hearing was held on May 16, 2019, regarding the pre-dispositional interim orders. ADoc. 8 and BDoc. 11. The trial court awarded temporary custody of the children to the Agency at that time as Boggs' home study had yet to be completed. *Id*.

{¶3} A guardian ad litem ("the GAL") was appointed for the children on June 6, 2019. ADoc. 11 and BDoc. 16. On July 12, 2019, the GAL filed her report and recommendations. ADoc. 19 and BDoc. 25. The GAL noted that the children had been placed in the temporary custody of Boggs in April of 2019 on a safety plan. *Id*. The GAL reported that the children appeared physically healthy and developmentally on track, but that Grilliot apparently had severe mental health issues. *Id*. Both children were considered to be safe in their placement with Boggs. *Id*. The GAL report indicated that Grilliot has tested positive in April 2019 for use

of methamphetamines, amphetamines, and THC. *Id*. After that first screen, Grilliot has continued to test positive for THC, but does have a medical marijuana card that became active May 2, 2019. *Id*. Grilliot was diagnosed with PTSD, Persistent Depressive Disorder, Generalized Anxiety Disorder, Bipolar Disorder, Borderline Personality Disorder, and Multiple Personality Disorder. *Id*. The GAL recommended that temporary custody of the children continue with Boggs under the protective supervision of the Agency. *Id*.

{¶4} On July 9, 2019, a case plan was submitted to the trial court. ADoc.15 and BDoc. 21. The case plan required Grilliot to 1) maintain a safe, stable home for the children; 2) complete substance abuse treatment and mental health treatment[2]; 3) not permit anyone else to use drugs around the children; and 4) receive parent education. *Id*. The case plan noted that the reason for the removal of both children was that Grilliot and Bibler "both tested positive for multiple substances" and that M.C. was vulnerable towards maltreatment as she was too young to report it. *Id*.

{¶5} A joint adjudication and disposition hearing was held on August 1, 2019. ADoc. 22 and BDoc. 28. At the hearing, the Agency presented the testimony of two witnesses. Amanda Sosa ("Sosa") testified that she is an investigator for the Agency and had been a case worker since May 17, 2018. Tr. 6, 38. Sosa testified as to the report of the alleged neglect and dependency and the actions she took after the report was received. Tr. 7-14. Sosa went to the home on April 11, 2019, to

---

[2] Interestingly, this requirement prohibited Grilliot from using "any * * * prescription medication or other substances."

conduct the investigation. Tr. 8. As part of the investigation, Grilliot submitted to a drug test via mouth swab. Tr. 13-14. The results of the drug test showed that Grilliot was positive for amphetamines, methamphetamines and THC. Tr. 15-16. Grilliot also tested positive solely for THC in a subsequent test. Tr. 16. The day Sosa went to the home to investigate, M.C. had been left with Bibler who Sosa claimed was under the influence of an illegal substance at the time he was watching the baby. Tr. 17. The basis for this claim was that Bibler had tested positive for illegal substances that day. Tr. 17. Sosa testified that she returned to Grilliot's home on April 16, 2019, to place the children with Boggs as was set forth in the safety plan. Tr. 18. Sosa indicated that in her opinion, the children were being neglected and dependent due to Grilliot's continued drug usage and Grilliot and Bibler being under the influence while caring for the children, one of which was an infant. Tr. 20-21.

{¶6} On cross-examination Sosa admitted that the house did not contain any hazardous conditions when she saw it and that the children appeared healthy. Tr. 22. Sosa indicated there was food in the home. Tr. 22. She did not observe any evidence of drugs in the home. Tr. 22. Sosa admitted that after the initial test, Grilliot tested positive for only THC. Tr. 29. When questioned about whether there was any evidence that Grilliot had used drugs in front of the children, Sosa admitted there was none. Tr. 35. When asked if there was anything in the report that she could verify the day of the visit, Sosa admitted there was not. Tr. 22.

{¶7} The Agency's second witness was Rebecca Shoemaker ("Shoemaker") who was the caseworker for the children. Tr. 45. She testified that the children were in the temporary custody of Boggs and there were no concerns with the placement. Tr. 46. According to Shoemaker, a homestudy of Boggs' home was completed and she was approved for placement. Tr. 47. The Agency requested that the children remain in the temporary custody of Boggs. Tr. 47. Shoemaker testified that the goal of the Agency was to reunify the children with Grilliot, but the children would remain under the protective supervision in the meantime. Tr. 48. Shoemaker stated that the temporary custody should be continued with Boggs until there was time for Grilliot to make progress on the case plan. Tr. 49.

{¶8} Shoemaker indicted on cross-examination that they wanted Grilliot to "maintain a safe and stable drug-free home" and receive parent education. Tr. 49-50. Shoemaker testified that the home-based coach would look at the issues of the family and tailor services to the family. Tr. 51. Shoemaker admitted that these services could happen while the children were still in the home. Tr. 52. Shoemaker also admitted that since April, the tests have shown that the only drug used by Grilliot was THC. Tr. 53. Shoemaker testified that Grilliot had already completed the GAIN assessment and that there was no further treatment recommended. Tr. 54. Shoemaker admitted that she did not know how a medical marijuana card would affect the case, but indicated that before the Agency would allow the children to be returned to the home, the Agency would need "a physician's understanding of what the Agency's requesting to make sure that the children are able to be cared for in a

safe manner." Tr. 55. Shoemaker admitted that she did not feel qualified to determine how a medical marijuana card affects the Agency's requirement that a home be drug-free. Tr. 58.

{¶9} Following Shoemaker's testimony, the Agency rested its case. Grilliot then testified on her own behalf. Grilliot testified that there were not methamphetamines in her home and there had never been any in the home. Tr. 62. Grilliot identified Ex. D as a letter from Blanchard Valley Health System noting that she came for an office visit on July 17, 2019, where she had a drug screen completed. Tr. 64. The screen showed she only tested positive for THC. Tr. 64. The letter further stated that the author did not believe Grilliot was misusing drugs. Ex. D. Grilliot then identified Ex. E as a letter from her doctor that provided with her authorization for a medical marijuana card. Tr. 65. The letter stated that Grilliot was compliant with all treatment recommendations and was under the care of the doctor and a mental health practitioner. Ex. E. The letter also stated that the doctor did not deem her to be a threat to herself, her children, or others. Ex. E. Grilliot identified Ex. F as her diagnostic assessment from Century Health. Tr. 66. Exhibit F stated that Grilliot went to the facility for a drug and alcohol assessment. Ex. F. According to Grilliot, the results showed she did not have an addiction problem and no recommendations were made. Tr. 66.

{¶10} The father of K.J. also testified. He indicated that he thought it would be in the best interest of K.J. for her to return to Grilliot's home. Tr. 84. He testified that the only drugs he ever knew Grilliot to use was marijuana and that he knew she

had a medical card for the use at this time. Tr. 84. At the conclusion of the hearing, the GAL made the following statement.

> **Your Honor, I agree with [the Agency's] case plan. And I do think that [Grilliot] has made great progress in getting things squared away in her home so she's able to effectively parent her children.**
>
> **I would like to see the children remain with their grandmother for a few more months, awhile longer, so that both [Bibler] and [Grilliot] can establish a consistent pattern of mental health treatment and counseling and drug substance abuse treatment.**

Tr. 90. The Agency requested that the trial court find the children to be neglected based upon the positive drug tests for drugs in April, and the fact that Grilliot allowed Bibler to watch the children even though he tested positive for prior drug use. Tr. 91. The trial court then found by clear and convincing evidence that the children were neglected and dependent children and placed them in the temporary custody of Boggs with protective supervision by the Agency.[3] Tr. 97, ADoc. 22, and BDoc. 28. Grilliot filed a timely notice of appeal. ADoc. 23 and BDoc. 30. On appeal, she raises the following assignments of error.

### First Assignment of Error

> **The trial court erred in finding the children neglected and dependent based largely on the mother's use of medical marijuana, said finding being contrary to statute.**

---

[3] A review of the transcript shows that the Agency also indicated a concern that Grilliot had allowed a convicted felon in the home. There was no evidence that Grilliot ever had any knowledge that this neighbor had a felony conviction in his past. This was never an allegation made in the complaints. Additionally, the issue was resolved prior to the filing of the complaint by Grilliot obtaining a restraining order to keep the man away from the home.

**Second Assignment of Error**

**The trial court's finding that the children were neglected and dependent was against the manifest weight of the evidence.**

**Third Assignment of Error**

**The trial court erred in finding a questionable drug screen to be clear and convincing evidence of neglect.**

**Fourth Assignment of Error**

**The trial court erred in removing the children from the home when the recommended services could be provided with the children residing in the home.**

**Fifth Assignment of Error**

**The trial court erred in finding the children to be neglected and dependent based on their mother's disability without giving appropriate weight to her compliance with treatment.**

{¶11} In the first and second assignments of error, Grilliot alleges that the trial court erred in finding the children to be neglected and dependent. To show that a child is neglected or dependent, the Agency must prove the allegations by clear and convincing evidence. R.C. 2151.35(A)(1). Clear and convincing evidence is a measure of proof which produces in the mind of the trier of facts a firm belief as to the allegations sought to be established. *In re Stoll*, 165 Ohio App.3d 226, 2006-Ohio-346, ¶ 20, 845 N.E.2d 581 (3d Dist.) citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954).

{¶12} A dependent child is defined as one

**(A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;**

**(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;**

**(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;**

**(D) To whom both of the following apply:**

**(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.**

**(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household.**

R.C. 2151.04. Here, the Agency alleged that the children were dependent under R.C. 2151.04(C), the condition and environment of the home. A determination of dependency requires no showing of fault by the parents, but instead focuses exclusively on the child's situation to determine whether the child is without proper or adequate care. *In re Riddle,* 79 Ohio St.3d 259, 262, 680 N.E.2d 1227 (1997). The parent's conduct is significant only if it has an adverse impact on the child sufficient to justify state intervention. *In re C.T.*, 6th Dist. Sandusky No. S-18-005, 2018-Ohio-3823, ¶ 60, citing *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). "A dependency finding based on a parent's use of illegal substances or abuse of legal substances 'requires 'some evidence that [the parent's] supervision of her children or the environment of her children has been affected in some negative way'

by the behavior of the parent.' " *In re C.T., supra* quoting *In re O.H.*, 9th Dist. Summit No. 25761, 2011-Ohio-5632, ¶ 9, quoting *In re R.S.*, 9th Dist. Summit No. 21177, 2003-Ohio-1594, ¶ 20.

{¶13} A neglected child is defined as one

**(1) Who is abandoned by the child's parents, guardian, or custodian;**

**(2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;**

**(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;**

**(4) Whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition;**

**(5) Whose parents, legal guardian or custodian have placed or attempted to place the child in violation of sections 5103.16 and 5103.17 of the Revised Code;**

**(6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare;**

**(7) Who is subjected to out-of-home care child neglect.**

R.C. 2151.03(A). Here, the complaint alleges that the children were neglected pursuant to R.C. 2151.03(A)(2), because the children allegedly lacked adequate parental care due to an action or habit of the parents. " 'Adequate parental care' means the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety

and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs." R.C. 2151.011(B)(1).

{¶14} In this case, Sosa testified that there was a positive drug test of Grilliot and Bibler in April for methamphetamines, amphetamines, and THC. However, she did not testify that Grilliot or Bibler appeared to be under the influence of any regulated substance at that time. Sosa testified that Grilliot's and Bibler's interactions with the children were appropriate. Tr. 24. Sosa also indicated that she observed no odd behavior on the part of Grilliot as part of her investigation. Tr. 34. Instead, she testified that M.C., the only child she observed, appeared clean and healthy. Tr. 21-22.. The home was clean, safe, and there was sufficient food. Tr. 22. Sosa also testified there was no sign of drug usage in the home. Tr. 22. Despite the alleged report of neglectful conditions, the environment was appropriate and Sosa left the children in the care of Grilliot and Bibler when she left the home, having seen nothing of significant enough concern to cause her to remove the children at that time. Sosa did not remove the children until the positive drug screen results were returned and did not file the complaint alleging the children to be neglected and dependent for approximately three weeks after the children were removed pursuant to the safety plan. No evidence was presented that would indicate that there was an actual issue with the children's environment. The only allegation in the report received by the Agency which was confirmed was that Grilliot and Bibler had used methamphetamines, amphetamines, and marijuana at some point prior to the time of the test. No evidence was presented that such use occurred in

the presence of the children or that it had an effect on the environment of the children. None of the allegations regarding the environment of the children, i.e. the drugs on the floor, the lack of food, and the failure to properly care for M.C., were supported by the testimony of either Sosa or Shoemaker. Although courts are not required to wait for a child to be injured or harmed before finding a child is neglected or dependent, there must be some evidence presented beyond a mere possibility of harm. Without the environment having any effect on the children or a demonstration of lack of adequate parental care, this Court cannot find that the Agency proved by clear and convincing evidence that the children were dependent or neglected. Thus the first and second assignments of error are sustained.

{¶15} Having determined that the Agency failed to present clear and convincing evidence that the children were dependent or neglected, we need not address the remaining assignments of error. App.R. 12(A)(1)(c). However, this Court notes that this case raised an interesting issue about the effect of permission to possess and use marijuana via a state issued medical marijuana card on a case plan requirement that a home be completely drug free. The Court notes the existence of new statutory language stating "[u]nless there is clear and convincing evidence that a child is unsafe, the use, possession or administration of medical marijuana in accordance with this chapter shall not be the sole or primary basis for any of the following: (1) an adjudication under section 2151.28 of the revised code determining that a child is an abused, neglected, or dependent child . . ." R.C.

3796.24.  How this will affect future case plans remains undetermined.  At this point in time, the question is not addressed by this court.

{¶16} Having found error in the particulars assigned and argued, the judgments of the Court of Common Pleas of Hancock County, Juvenile Division is reversed and the matter is remanded for further proceedings in accord with this opinion.

***Judgments Reversed***
***And Causes Remanded***

**SHAW, P.J. and PRESTON, J, concur in Judgment Only.**


**/hls**