[Cite as *In re R.M.*, 2026-Ohio-1591.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re R.M., R.H.

COURT OF APPEALS NO. H-25-021
H-25-022

TRIAL COURT NO. DNA 2024 00034
DNA 2024 00035

**DECISION AND JUDGMENT**

Decided: May 1, 2026

* * * * *

Miles T. Mull, Esq., for appellant, H.M.

Richard H. Palau, Esq., Prosecutor for appellee, Huron County Department
of Jobs and Family Services.

* * * * *

**DUHART, J.,**

{¶ 1} This is a consolidated appeal filed by appellant, H.M. ("mother"), from four

judgments of the Huron County Court of Common Pleas, Juvenile Division, rendered on

May 8, 2024, July 16, 2024, July 19, 2024 and August 29, 2025. For the reasons that

follow, we affirm the trial court's judgments.

**{¶ 2}** Mother sets forth three assignments of error:

1. The trial court erred by improperly removing the children, R.M. and R.H., from their Mother's care without an investigation as to whether shelter care was warranted or required and without any testimony or evidence presented of concerns, reasonable efforts to avoid the removal of the children, or in support of the reasonable grounds for removal as defined by R.C. §2151.31(A)(3).

2. The trial court erred when it adjudicated the minor children as Dependent; such a finding was not supported by clear and convincing evidence as required by R.C. §2151.35(A) & Juv.R. 29(E)(4) and was against the manifest weight of evidence presented at trial.

3. The trial court abused its discretion in its Dispositional Order that limited the mother's contact with the minor children to be supervised only, without any credible evidence that the children would be under the threat of harm while in their mother's care.

### Background

**{¶ 3}** Mother has two children, R.H., who was born in February 2014 and R.M., who was born in December 2019.  C.H. is R.H.'s father and A.K. is R.M.'s father.  Mother was not married to either father.  Prior to May 2024, the children lived with mother.  R.M. did not see her father, but R.H. visited with her father every other week, pursuant to a parenting decree.

**{¶ 4}** In the early morning hours of May 1, 2024, mother was at her sister-in-law, B.G.'s, house ("the house"), with two male friends.  Also in the house were mother's children and B.G.'s three children; all of the children were upstairs.  B.G.'s 15-year-old daughter ("daughter" or "B.G.'s daughter") was babysitting mother's children.

2.

**{¶ 5}** While in the basement, the women went into the bathroom/utility room ("utility room") together and locked the door. After 30-45 minutes or so, the men picked the lock of the door and found the women on the floor, unconscious. On the sink, close to where the women were passed out, were a green straw and a white, powdery substance ("the substance"). The men called 911 and performed CPR on the women until the police and EMS arrived and took over helping the women.

**{¶ 6}** While EMS was working on the women, B.G.'s teenage son ("son") went down to the basement, followed thereafter by B.G.'s daughter. Mother regained consciousness after EMS administered two sprays of Narcan but B.G. only regained consciousness after she received two sprays of Narcan and an IV of Narcan. Although both women were conscious, they did not speak or interact with EMS or police, who had asked the women what drugs they took. Mother and B.G. were transported to the hospital by ambulance and were admitted into the ICU. Mother's children were left in the care of B.G.'s daughter. Police collected the substance and straw as evidence.

**{¶ 7}** Thereafter, police notified the Huron County Department of Job and Family Services ("the agency") of the alleged overdoses.

**Complaints and Shelter Care Hearing/May 8, 2024 Shelter Care Judgment**

**{¶ 8}** On May 3, 2024, the agency filed initial complaints alleging that RM. and R.H. were dependent children, as defined by R.C. 2151.04(C), and that it was in the children's best interest for the agency to assume the children's guardianship. The complaints set forth the following facts upon which the allegations are based:

3.

The agency initially became involved with the family on 5/3/24 when the agency was contacted about an overdose that occurred on 5/1/24. It was reported to the agency that mother was at a friend's home with the children, and both mother and her friend overdosed in the bathroom, emergency services were contacted, and mother and the friend were both hospitalized and in the ICU. The agency contacted mother on 5/3/24 shortly after this report was received, and mother stated that she was not going to allow any contact without a lawyer present, she would not be cooperating with the agency, and that she did not have a drug problem. Efforts to assist were denied and this constitutes an emergency.

{¶ 9} Also on that day, the trial court held an emergency shelter care hearing, which mother attended. She completed a financial disclosure form for appointed counsel, indicating that she had zero income and zero expenses. She was asked if she was in treatment and she responded she was in mental health counseling, not treatment. The trial court placed R.M. in the temporary custody of her maternal aunt, B.M. ("aunt") with protective supervision by the agency and R.H. was placed in the temporary custody of her father, but the court ordered that R.H. would stay with aunt every other week. Mother was allowed only supervised contact with the children.

**Adjudicatory Hearing/July 16, 2024 Judgment**

{¶ 10} On July 15, 2024, the adjudicatory hearing was held. The agency called one of the officers, Detective Sergeant Alexis Harvey, who had responded to the house on May 1, 2024. Harvey testified that she found two females unconscious and unresponsive on the floor, Narcan was administered to the women by EMS due to their suspected drug overdoses after which both women eventually responded to the Narcan and became conscious, but incoherent. During Harvey's testimony, the agency moved for the

4.

admission of her bodycam video, as well as a still frame from the bodycam showing the substance and straw on the sink in the utility room; the requests to admit into evidence the video and the still frame picture were granted, without objection.

{¶ 11} The agency also called its investigation caseworker, Rachel Cwalina, who testified that she contacted mother and asked to see the children to make sure they were safe, but mother said she would not meet without an attorney present. The caseworker informed mother about treatment options, but mother advised that she did not have a drug problem and did not need treatment.

{¶ 12} Mother testified that on the evening of April 30, 2024, she only drank alcohol and did not use any other substance. She arrived at the house with two men; B.G. was at the house but was not expecting mother and the men. Mother, B.G. and the men were in the basement, sitting and watching tv and listening to music videos. Mother's children were upstairs, cared for by B.G.'s daughter. Mother explained that she had gotten her period on May 1, 2024, so she and B.G. went into the utility room so B.G. could give mother sweatpants to wear. Mother has no memory of what happened after she went into the utility room; her next memory was waking up in the hospital. She said she has never failed a drug screen and does not believe she has a substance use issue. She also said she has never seen B.G. do drugs.

{¶ 13} The trial court found the children dependent, as alleged in the complaints.

**Dispositional Hearing/July 19, 2024 Judgment**

{¶ 14} On July 17, 2024, the dispositional hearing was held. The guardian ad litem ("GAL") for the children testified that she was not asking for any changes in the children's circumstances. The GAL met with R.H., and R.H. was very comfortable in her situation with her father and only wanted to see her sister more. Mother's counsel then requested that the trial court reconsider its adjudication for dependency, claiming the evidence was not clear and convincing that the children were dependent. The trial court construed the request as a motion for reconsideration, which it denied.

{¶ 15} R.H.'s father testified that everything was going well with R.H., and in light of everything that "we've seen and heard" he believed R.H. was in the best care under his protection.

{¶ 16} The agency's ongoing caseworker, Brittany Bennett, testified about the case plan which she helped formulate. She shared information about multiple previous reports made to the agency about mother - that mother slept all day which may be an indication of substance use and/or mental health concerns, mother often felt ill, had anxiety and depression and told the children to stay in their bedroom at night because mother had people over, and R.H., who did not know these people, would get in trouble if she left her room. The agency was also concerned about the potential lack of supervision of the children by mother, as the children were asked to walk across the parking lot of the apartment complex at night.

6.

{¶ 17} Bennett further testified that there was an overdose report regarding mother from the hospital which started the agency's case. Bennett recalled the original discharge paperwork from the emergency room mentioned an opiate overdose. In addition, it was Bennett's understanding, from law enforcement reports, that B.G. also overdosed in the house when her husband, R.G., was there, although he did not overdose.

{¶ 18} Mother called B.G. to testify at the hearing. B.G. stated she works in the nursing field and on April 30 into May 1, 2024, her daughter and son were both babysitting mother's children at the house while B.G. was working on the house, scraping paint and painting, during which B.G. drank two wine coolers and two shots of tequila. B.G. did not know anything about the substance on the utility room sink, but said she used "straws taped together and twined together and . . . put them in between the wooden slats of the potters" she makes, so the holes stay open and water can drain out. She recalled that while in the utility room, mother's knees buckled, mother folded and collapsed and B.G. tried to help mother before B.G. also passed out. B.G. did not testify that she went into the utility room to get sweatpants for mother because mother started her period.

{¶ 19} B.G. did testify that she was subsequently investigated by the agency, and her husband was approved as a supervisor of her children, so her children were not removed and the case was closed. B.G. was asked if, prior to that, she had an open case and her children were removed, and B.G. replied that her children were never removed.

7.

{¶ 20} The trial court approved the agency's case plan, which required mother to address her issues and had as its goal reunification. The court continued the children's placement orders and mother's supervised contact with the children. The court stated it was satisfied that the existing orders were "certainly in the best interest of the children."

**First Appeal/Findings of Fact and Conclusions of Law/Current Appeal**

{¶ 21} Mother appealed the trial court's shelter care judgment, adjudicatory judgment and dispositional judgment. This court remanded the matter for the trial court to issue findings of fact and conclusions of law. *See In re R.M.*, 2025-Ohio-2909 (6th Dist.).

{¶ 22} On August 29, 2025, the trial court issued findings of facts and conclusions of law. Mother appealed.

## First Assignment of Error

{¶ 23} Mother argues the trial court erred by improperly removing the children from her care without an investigation as to whether shelter care was warranted or required and without any testimony or evidence of concerns, reasonable efforts to avoid the children's removal, or in support of the reasonable grounds for removal. Mother separates her arguments in support of this assigned error into two issues:

> 1. Did the trial court follow the proper procedures required to remove a child from the care of their parent and legal custodian?

> 2. Was the decision to remove the children from the mother's care against the manifest weight of the evidence?

8.

**Mother's Arguments**
**First Issue**

{¶ 24} Mother argues that in order for a child to be placed or remain in shelter care, the trial court must follow four steps. First, before holding a shelter care hearing, R.C. 2151.314(A) requires that the court provide notice of the purpose of the hearing and notice of a party's rights, including the right to counsel, and, if a party is indigent, provide the name and number of a court employee to arrange for the appointment of counsel. Next, pursuant to R.C. 2151.314(B)(l) - (3), a shelter care hearing must be held where the court shall: (l) determine whether the child should be placed in or remain in shelter care; (2) determine if there are appropriate relatives for placement of the child; and (3) comply with R.C. 2151.419, to determine whether the agency made reasonable efforts to prevent the child's removal or to return the child to the home.

{¶ 25} Mother, citing R.C. 2151.314(A), submits a child must be released from shelter care unless it appears that such care is warranted or required under R.C. 2151.31(A)(3), which states:

> A child may be taken into custody . . . [b]y a . . . duly authorized officer of the court when any of the following conditions are present:
>
> (a) There are reasonable grounds to believe that the child is suffering from illness or injury and is not receiving proper care . . . and the child's removal is necessary to prevent immediate or threatened physical or emotional harm;
>
> (b) There are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate or threatened physical or emotional harm;

9.

(c) There are reasonable grounds to believe that a parent, guardian, custodian, or other household member of the child's household has abused or neglected another child in the household and to believe that the child is in danger of immediate or threatened physical or emotional harm from that person.

{¶ 26} Mother contends that at the shelter care hearing: the trial court made her aware of the allegations in the complaints as well as potential dispositions and her right to counsel; she promptly requested that counsel be appointed, after which the court advised her that she would be given an application, and if eligible, counsel could be appointed right away; the prosecutor requested temporary custodial placement of the children with aunt and supervised visits of the children by mother; and the court inquired about the children's fathers' custodial rights, aunt's work schedule and aunt's ability to take temporary custody of R.M. The court then issued shelter care orders from the bench.

{¶ 27} Mother argues that within the first step of the shelter care hearing, as defined by R.C. 2151.314(B)(1), the trial court is tasked with determining whether the child should be placed in or remain in shelter care, but the court failed to engage in this step in any meaningful way. She submits there was no testimony or evidence from the investigating caseworker, there were no reports regarding the agency's concerns with her, outside of an acknowledgment that complaints were filed which contained concerns, and no testimony or evidence was presented that addresses the reasonable grounds for removal of the child, as outlined in R.C. 2151.31(A)(3)(a) - (c).

{¶ 28} Mother contends that after the agency's recitation of its recommendations, the trial court inquired about familial placement options for the children, reviewed aunt's

10.

recommendation and asked about the children's fathers, which satisfied R.C. 2151.314(B)(2). Mother notes that the final step required when a shelter care hearing is held, if the children are remaining in shelter care, is for the court to make a reasonable efforts determination, pursuant to R.C. 2151.314(B)(3). She observes that Juv.R. 27(B)(1) and R.C. 2151.419(A)(1) define this requirement, and mandate that the court determine whether the agency made reasonable efforts: to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the home, or to make it possible for the child to return home safely. Mother maintains there is no determination of reasonable efforts in the court's judgment, nor is there any testimony or evidence in the hearing transcript on this topic. Moreover, she submits that R.C. 2151.419(A)(1) provides that the agency has the burden of proving it has made those reasonable efforts.

{¶ 29} Mother claims that due to this procedural deficiency, there was, and is, no credible evidence that any of the reasonable grounds for the children's removal from her care existed. Thus, she insists that the removal was procedurally improper, it was an abuse of discretion and against the weight of the evidence. She argues that without any evidence or testimony as to reasonable grounds, it is against the manifest weight of the evidence that those grounds existed, and without the presentation of testimony or evidence as to the reasonable efforts employed by the agency to prevent the removal of the children from the home, it is against the manifest weight of the evidence that there were any efforts made to do so.

11.

**Second Issue**

{¶ 30} Mother argues that a question which arises when considering whether to overturn an order in a dependency case is whether the order is against the trial court's best interest determination. This is a paramount consideration because the purpose of the agency is to protect children from harm and dangers, whether from specific people or their conditions and environment. She asserts the testimony and evidence necessary to have made those determinations at the shelter care hearing can be understood from the transcript of the adjudicatory hearing, where she contends that Caseworker Cwalina testified as follows.

{¶ 31} On the morning of May 3, 2024, the agency received a concern that mother overdosed and her children were present. When the agency contacted mother by phone, she indicated she wished to have counsel present for interactions with her and her children. Within 10 minutes of the initial phone call, Cwalina contacted her supervisor and then the prosecutor's office, after which an emergency shelter care hearing was arranged to remove the children from mother's care. Mother was called again to inform her there would be a shelter care hearing an hour later. Cwalina knew that R.H. was in school but made no effort to contact the school, ask mother for permission to go to the school or attempt to verify R.H.'s safety. During Cwalina's sight and safety check of aunt's home, Cwalina made contact with R.M., who appeared to be in good health and did not have any scrapes, cuts or bruises; Cwalina had no concerns for R.M.

12.

{¶ 32} Mother argues the foregoing illustrates that even if this testimony had been elicited at the shelter care hearing, reasonable grounds for placing the children into shelter care were not present as there was no immediate threat of harm to the children by the parents or guardians' actions or from their conditions or environment. In addition, the children were not suffering from any injuries or illnesses which were not being appropriately cared for, and "the parents [did not have] any other children that had been adjudicated abused or neglected." Mother insists that not only were no efforts made to avoid the removal of the children, but that removal occurred immediately after she stated she wanted to speak with an attorney. Mother contends that the agency suggests that mother's request for an attorney is equivalent to denying the agency's efforts to assist, however, this could not be further from the truth.

{¶ 33} Mother argues that due to the lack of evidence presented to support the removal of the children from her home, the shelter care orders should be vacated and the children returned to her custody and care.

**Agency's Arguments**

{¶ 34} The agency argues there is a lack of understanding about the legal process for shelter care hearings and remedies in mother's arguments. The agency notes that shelter care hearings are generally directed toward the prompt resolution of emergency custody issues, and place primacy on the immediate safety and protection of the children. Such hearings are, pursuant to R.C. 2151.314(A), informal and allow any evidence to be considered without regard to the formal rules of evidence, per Juv.R. 7(F)(3), and

13.

witnesses and testimony are not required at hearings. The agency observes that hearings are conducted to determine whether there is probable cause for an emergency order of shelter care, citing R.C. 2151.31(E) and R.C. 2151.314(B)(1).

{¶ 35} The agency asserts sworn complaints were filed and the complaints and summons were personally served on mother on May 3, 2024. The complaints clearly stated that mother and B.G. overdosed with mother's children in the house, that mother was not cooperating with the agency, and efforts to assist were denied which constitutes an emergency. A shelter care hearing was held, attended by mother, who requested and received court-appointed counsel. R.M. was placed in aunt's temporary custody and R.H. was placed in her father's custody.

{¶ 36} The agency notes that on June 13, 2024, mother's counsel requested a continuance of the adjudicatory hearing scheduled for that day. The request was granted and the hearing was rescheduled for July 15, 2024.

{¶ 37} On June 24, 2024, a new attorney for mother filed a notice of appearance and substitution of counsel. Neither counsel for the agency nor mother filed a motion for a shelter care rehearing, asserting lack of counsel for mother at the shelter care hearing. The agency observes that R.C. 2151.314(C) provides:

> If a child is in shelter care . . . any party . . . may file a motion with the court requesting that the child be released from shelter care. The motion shall state the reasons why the child should be released from shelter care and, if a hearing has been held . . . , any changes in the situation of the child or the parents, guardian, or custodian of the child that have occurred since that hearing and that justify the release of the child from shelter care. Upon the filing of the motion, the court shall hold a hearing . . .

14.

{¶ 38} In addition, the agency cites to Juv.R. 7(G)(1), regarding rehearing, which states in relevant part:

> After a child is placed in shelter care . . . any party . . . may file a motion with the court requesting that the child be released from . . . shelter care. Upon the filing of the motion, the court shall hold a hearing within seventy-two hours.

{¶ 39} The agency also relies on *In re Careuthers*, 2001 WL 458681, *2-3 (9th Dist. May 2, 2001):

> [T]he appellant was notified "personally" of the hearing and the record indicates that appellant did, in fact, attend the hearing. Moreover, the appellant failed to file a motion for rehearing, asserting the lack of counsel at the shelter care hearing. Consequently, she may not now attempt to raise this issue on appeal, Juv.R. 40(E)(3)(b); *In re Griffin*, [1983 WL 3898, *1 (9th Dist. Nov. 2, 1983)]. Therefore, this argument is without merit.

{¶ 40} The agency contends that since mother's counsel failed to file a motion for shelter care (rehearing) under R.C. 2151.314(C) or the Juvenile Rules, mother may not attempt to raise the issue on appeal.

{¶ 41} The agency submits the standard is clear and convincing evidence, and the trial court's finding, by clear and convincing evidence, is not against the manifest weight of the evidence. The agency argues that the trial court is in the best position to consider the credibility of witnesses, as the court observes the intangible facial expressions, voice inflections and pauses which are not apparent in a sterile manuscript. The agency cites to *In re Cunningham*, 59 Ohio St.2d 100, 105-06 (1979), where the Supreme Court of Ohio held that "the time-honored precedent in this state that the 'best interests' of the child are

15.

the primary consideration in questions of possession or custody of children." The agency asserts that mother failed to prove that "it would be against the manifest weight of the evidence for the Court to make its finding."

### Shelter Care Law

{¶ 42} R.C. 2151.31(A)(3) provides, inter alia, that an authorized court officer may take a child into custody if there are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and the child's removal is necessary to prevent immediate or threatened physical or emotional harm. *See also* Juv.R. 6(A)(3)(b).

{¶ 43} R.C. 2151.314(A) states, in part, that "[w]hen a child is brought before the court or delivered to a place of . . . shelter care designated by the court, the . . . authorized officer of the court shall immediately make an investigation and shall release the child unless it appears that the child's . . . shelter care is warranted or required under section 2151.31 of the Revised Code. If the child is not so released, a complaint . . . shall be filed . . . and an informal . . . shelter care hearing held promptly . . . to determine whether . . . shelter care is required."

{¶ 44} R.C. 2151.314(B) provides, in pertinent part, that "[w]hen the court conducts a hearing pursuant to division (A) . . . (1) The court shall determine whether an alleged . . . dependent child should remain or be placed in shelter care . . ."

{¶ 45} In *In re Moloney*, 24 Ohio St.3d 22, 25 (1986), the Supreme Court of Ohio found:

16.

A temporary shelter care hearing simply is not an adjudication . . . An order of temporary shelter care is made in recognition that a person of tender years is defenseless, unable to care for himself and that his natural needs for food, clothing and shelter demand that someone immediately assume the responsibilities that the parents have ignored. A shelter care decree is in no sense dispositive; it is interlocutory in nature, limited in scope and purpose, and temporary in duration. It responds to an emergency-the immediate physical needs of the child- until the court can fully inquire into the facts and decide what is best for the child.

{¶ 46} R.C. 2151.314(C) provides in part that "[i]f a child is in shelter care . . . any party . . . may file a motion with the court requesting that the child be released from shelter care. . . . Upon the filing of the motion, the court shall hold a hearing . . ." *See also* Juv.R. 7(G)(1).

{¶ 47} "If a parent . . . seeks to attempt to release a child from shelter care, the parent has the opportunity to file a motion with the court stating the reasons that justify a change in the court's ruling. R.C. 2151.314(C); Juv.R. 7(G). . . Upon filing of such a motion, the court shall rehear the matter. . . *See*[] *also*[]*, Linger v. Weiss . . .*, 57 Ohio St.2d 97, 101 [(1979)]." *In re Careuthers*, 2001 WL 458681, at *2 (9th Dist.).

## Analysis

{¶ 48} Upon review, mother argues that the trial court erred when it removed the children without an investigation as to whether shelter care was warranted or required and without testimony or evidence of concerns, reasonable efforts to avoid the removal of the children or in support of the reasonable grounds for removal. She claims that based on the lack of evidence presented to support the removal of the children, the shelter care orders should be vacated and the children returned to her custody and care.

{¶ 49} We find, after reviewing the record and the applicable law, that the trial court did not err when it removed the children from mother's care after the shelter care hearing. The court had before it the agency's complaints containing allegations, based on the investigation by the agency, of mother's overdose and hospitalization, the agency's concerns that the children were in the house when mother and B.G. overdosed, and the agency's efforts to speak with and assist mother, which efforts were denied, thus constituting an emergency since mother would not allow the agency to have any contact without a lawyer present, would not cooperate with the agency, denied doing drugs and denied having a drug problem. The court also questioned mother before it ordered the children's removal.

{¶ 50} We find there was evidence before the court of the agency's investigation and concerns, reasonable grounds for the children's removal from mother's care due to her overdosing with the children in the house, and reasonable efforts to avoid the children's removal when the agency contacted mother to ensure the children were safe, but mother resisted and refused to cooperate. Although mother takes issue with the lack of testimony presented at the shelter care hearing, she offers no legal authority that the presentation of testimony is required. Moreover, while mother seeks the return of her children due to a lack of evidence to support their removal, she failed to avail herself of the procedure provided in R.C. 2151.314(C) and Juv.R. 7(G). Mother could have challenged the shelter care order by filing a motion with the trial court with reasons she believed justified a change in the court's order, but she did not do so.

18.

**{¶ 51}** Based on the foregoing, we find mother's first assignment of error not well-taken.

**Second Assignment of Error**

**Mother's Arguments**

**{¶ 52}** Mother argues R.C. 2151.35(A) and Juv.R. 29(E)(4) mandate the burden of proof is clear and convincing evidence "when the issue is in a dependency . . . case." She asserts the State failed to meet this burden and the adjudication of dependency is against the manifest weight of the evidence.

**{¶ 53}** Mother notes that in its findings of fact and conclusions of law, the trial court found the agency "proved by clear and convincing evidence that the conditions and environment of [the minor children] between 30 April 2024 and 3 May 2024 warranted the agency's intervention." The court listed specific findings in support, but mother submits there were no findings that she had used any substance of abuse, was medically diagnosed as having overdosed on any substance or what the substance was. She argues in the absence of such findings, the concerns presented by the agency are circumstantial and are not clear and convincing evidence that she used illicit substances of abuse or that illicit substances caused her unconscious state when she was discovered by police.

**{¶ 54}** Mother submits that Caseworker Cwalina testified at the adjudication hearing that she met with mother prior to the shelter care hearing for a sight and safety check of aunt's home, and Cwalina observed R.M., who was not injured, and there were

19.

no concerns for R.M. at that time.  Cwalina requested that mother take a drug screen; mother claims Cwalina testified there was no indication of any positive drug screens.

{¶ 55} Mother notes Detective Harvey testified that upon responding to the house in the early morning hours of May 1, 2024, mother was found unconscious on the floor and EMS, who arrived at the same time, administered Narcan to mother.  Harvey recounted her training in the use of Narcan and Naloxone as a first responder, and Narcan "works for mostly opioid overdoses" and not anything else.  Harvey acknowledged her training did not qualify her to diagnose the "reasons that a person could be passed out on the floor."  Harvey recalled collecting as evidence the substance and straw from the sink in the utility room because she suspected it was drugs and drug paraphernalia, but she admitted they were never tested nor was there an on-going criminal investigation due to the substance or the events of May 1, 2024.

{¶ 56} Harvey further testified that mother's children were upstairs in the house, asleep, being babysat by B.G.'s daughter when mother was found unconscious.  Before leaving the house, Harvey confirmed that daughter was "comfortable continuing to watch the children," so Harvey did not believe the children were in danger of harm.

{¶ 57} Mother insists the evidence was that: 1) the agency received a report of concern, 2) mother requested an attorney for a meeting with the caseworker, 3) mother was negative on the drug screen administered that day, 4) mother had not had any other positive screens, and 5) that the only child observed by the caseworker before the shelter care hearing was free of any apparent concerns.

20.

{¶ 58} Mother cites to *In re Burrell*, 58 Ohio St. 37, 39 (1979), which establishes the clear and convincing evidence standard requires that the impact of the concerns on the conditions or environment of the child or children "cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." Mother concedes, however, that this court in *In re A.C.*, 2010-Ohio-4933, ¶ 75 (6th Dist.), quoting *In re Burchfield*, 51 Ohio App.3d 148, 156 (4th Dist. 1988), set forth that "'the law does not require the court to experiment with the child's welfare to see if . . . [the child] will suffer great detriment or harm.'" Mother claims "that is not to say that a mere suggestion of a possibility is, or should be, enough to show by *clear and convincing* evidence that the child is dependent." (Emphasis in original.)

{¶ 59} Mother notes the trial court, in its findings of fact and conclusions of law, cites *In re N.J.*, 2017-Ohio-7466, ¶ 20, 23 (12th Dist.), in support of its finding of dependency, however, that case involved an adjudication for the dependency of two children whose siblings had been disciplined excessively by their father while the two children were present.

{¶ 60} Mother also cites to *In re A.V.*, 2021-Ohio-3873, ¶ 2-3, 14 (12th Dist.), which involved four children, ages nine to fourteen, who were adjudicated dependent by the juvenile court due to their parents' drug abuse, where the parents admitted using and testing positive for substances, including cocaine, opiates, PCP and methamphetamines. One parent denied doing drugs when the children were present, but the other parent admitted doing drugs in the garage when the children were asleep inside the home and he

was the sole caregiver. *Id.* at ¶ 11-13. It was undisputed that the children were all doing well, had no knowledge of the parents' drug use and were not impacted by the parents' drug use. *Id.* Mother notes that children services, in support of its argument to affirm the juvenile court's finding, cited the holding in *In re N.J.* The appellate court reversed and vacated the juvenile court's dependency adjudication, finding that children services failed to establish that parents' drug use had an actual adverse impact on their children. *Id.* at ¶ 30-31.

{¶ 61} In addition, mother cites to *In re C.T.*, 2018-Ohio-3823, ¶ 60 (6th Dist.), where this court, quoting *In re O.H.*, 2011-Ohio-5632, ¶ 9 (9th Dist.), quoting *In re R.S.*, 2003-Ohio-1594, ¶ 20 ( 9th Dist.), held that "[a] dependency finding based on a parent's use of illegal substances or abuse of legal substances 'requires "some evidence that [the parent's] supervision of her children or the environment of her children has been affected in some negative way" by the behavior of the parent.'"

{¶ 62} Mother asserts the agency's complaints were that her children were dependent due to a suspected overdose that occurred at the house of a relative, yet mother contends the children were cared for by B.G.'s daughter, with no evidence that the event negatively impacted the children, who were not present for or witness to the drug use, and there was no evidence of other potential concerns or legitimate risks of harm. Mother argues there was no evidence clearly or convincingly proving that there were any drugs found at the house, that she had used any illegal drugs or of her medical condition or diagnosis that night. Mother further claims there was no evidence that drug use even

22.

occurred outside of the circumstantial evidence that multiple doses of Narcan were administered to her and that, sometime following those doses, she regained consciousness.

{¶ 63} Moreover, mother submits the evidence indicates that she requested the assistance of counsel to understand and protect her rights, but the agency's response was to schedule an emergency shelter care hearing. Mother observes that the hearing was held and her children were removed from her care, all before counsel was appointed.

{¶ 64} Lastly, mother maintains that not only does the evidence show the agency did not make reasonable efforts to prevent the children's removal from her care, but the trial court commented "[i]t's arguable whether the [a]gency could have made a couple more phone calls, attempted to wait a little longer to communicate with (indiscernible) . . ."

**Agency's Arguments**

{¶ 65} The agency argues much of its response was covered under the first assignment of error but notes and highlights the important facts adduced at the adjudicatory hearing. The agency asserts it is ridiculous to argue that mother and her sister-in-law overdosing in the house where the children were did not have a negative impact on the children. The agency contends that harmful conditions which occurred in the same house where the children were warrants state intervention. The agency submits it does not have to wait for the children to actually be harmed, such as experiencing an accidental overdose, in order to act on a concern in a dependency case.

23.

**Standards of Review**

{¶ 66} Pursuant to R.C. 2151.35(A)(1) and Juv.R. 29(E)(4), the agency must present clear and convincing evidence in order to prove that a child should be adjudicated dependent. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.*, 2023-Ohio-4703 ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus. "[S]ufficiency is a test of adequacy" and an appellate court should affirm a trial court's judgment when the evidence is legally sufficient to support the verdict as a matter of law." *In re Z.C.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 67} When conducting a manifest weight review of a trial court's judgment, the appellate court "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re Z.C.* at ¶ 14, citing

24.

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), at syllabus; *State v. Wilson*, 2007-Ohio-2202, ¶ 24. *See also In re B.K.*, 2010-Ohio-3329, ¶ 33 (6th Dist.).

**Law**

**R.C. 2151.04**

{¶ 68} A dependent child is defined, in R.C. 2151.04(C) as a child:

(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship . . .

**Case Law**

{¶ 69} Circumstances which give rise to a legitimate risk of harm to a child may suffice to support an adjudication of dependency under R.C. 2151.04(C). *In re N.J.*, 2017-Ohio-7466, at ¶ 20 (12th Dist.). *See also In re Ha.S.*, 2025-Ohio-5735, ¶ 17 (6th Dist.)

**Cases Cited by Mother**

{¶ 70} Two of the cases cited by mother, *In re A.V.*, 2021-Ohio-3873 (12th Dist.) and *In re C.T.*, 2018-Ohio-3823, ¶ 60 (6th Dist.), are distinguishable from the present case, as neither case involved a parent overdosing in a home with children present. In the case of *In re A.V.*, there was no overdose, and in the case of *In re C.T.*, the mother overdosed but no child was in the home at the time.

25.

**Analysis**

{¶ 71} Upon review, we find that the trial court's adjudication of the children as dependent was proven by the agency by clear and convincing evidence, as the children's environment was such as to warrant the State, in the interests of the children, to assume guardianship. We further find that the court's decision is supported by some competent, credible evidence and is not against the manifest weight of evidence.

{¶ 72} At the adjudicatory hearing, the evidence before the court included Detective Harvey's bodycam footage and her testimony. The bodycam showed the two men in the utility room with mother and B.G. on the floor, unconscious, not moving, with CPR being performed. The detective immediately asked if the women took something. Police officers and EMS workers arrived and rendered aid, attempting to revive the women. After receiving Narcan, the women were brought somewhat to consciousness. The efforts to resuscitate mother took over 10 minutes, while it took over 30 minutes for B.G. The bodycam also showed the substance and green straw on the utility room sink, which the detective collected as evidence.

{¶ 73} Detective Harvey's testimony was consistent with her bodycam footage, and she further testified that the events occurred while mother's children were in the house, that the women were transported by EMS to the hospital where they received additional treatment and the substance and straw were collected as evidence because the detective suspected they were drugs and drug paraphernalia. The detective also testified

26.

about her training with respect to the use of Narcan and Naloxone and noted that Narcan "works for mostly opioid overdoses" and not anything else.

{¶ 74} Mother's testimony, in part, was consistent with the bodycam footage and the detective's testimony in that mother testified that she and B.G. were passed out and unconscious, Narcan was administered after which both women somewhat regained consciousness, and the events all happened with mother's children in the house. Yet, mother testified that she drank alcohol but did not use drugs on April 30 into May 1, 2024, and she did not see B.G. use drugs.

{¶ 75} Also before the court was Caseworker Cwalina's testimony about her contact with mother, and that mother indicated she did not have a drug problem and did not need treatment.

{¶ 76} Since the trial court determines what weight and credibility to give to witness testimony, the court was in the best position to judge credibility, and we defer to its credibility determinations. A review of the record indicates that the agency became involved with mother and her children due to concerns which arose after mother was hospitalized for a suspected drug overdose. Just days before the children were removed from mother's custody, she was found unconscious, help had to be summoned, mother was given Narcan, revived and then hospitalized, all while her four-year old and ten-year old daughters were in the house.

{¶ 77} Mother did not acknowledge that she took drugs or overdosed, even though Detective Harvey testified that Narcan works for mostly opioid overdoses, not anything

27.

else, and the substance and straw were collected as suspected drug paraphernalia and drugs. Mother's failure to take responsibility for her actions poses a legitimate risk of harm to her children and their environment, because her young children are dependent on mother for care and supervision, and they are unable to protect themselves. Having a parent unconscious with suspected drugs and drug paraphernalia nearby while children are in the home, coupled with the parent's failure to acknowledge or address substance use issues, creates an inappropriate environment for children.

{¶ 78} Based upon the foregoing, we find mother's second assignment of error not well-taken.

### Third Assignment of Error

**Mother's Arguments**

{¶ 79} Mother argues that the trial court abused its discretion in its dispositional order which limited her contact with her children to be supervised only, without any credible evidence that the children would be under the threat of harm while in mother's care.

{¶ 80} Mother, citing R.C. 2151.35(B)(1), submits when a trial court adjudicates a child dependent, it must hold a separate dispositional hearing and issue any dispositional orders in accordance with R.C. 2151.353, which provides that "the court shall not issue a dispositional order . . . that removes a child from the child's home unless the court complies with [R.C.] . . . 2151.419 . . . [a]nd includes in the dispositional order the findings of fact required by that section." R.C. 2151.419 states that when a child is

28.

removed from a parent's care, there must be a showing of reasonable efforts made by the removing party "to prevent the removal of the children from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home" and that "the agency shall have the burden of proving that it has made those reasonable efforts."

{¶ 81} Mother asserts the agency made no efforts to prevent the removal of the children, nor were any efforts made in the 73 days between shelter care and adjudication to prevent the continued removal of the children. She further claims the agency failed to show that a concern existed for the safety of the children with their mother, and there was no evidence from the date of the complaints to the date of disposition that mother used illegal substances.

{¶ 82} Mother notes that the prosecutor, in closing remarks, stated, "Actually, this is a positive test because they were revived by Narcan. Narcan only works on opiates. It doesn't do anything else for you . . . It's quite clear that there is an issue. And I'm just afraid that unless these issues are addressed, work on this case is going to be slow as far as reunification."

{¶ 83} Mother further argues that in the dispositional order, the trial court failed to issue any written findings of fact or conclusions of law, the court failed to address the best interest standards reviewed, and the court did not address any reasonable efforts of the agency. Moreover, mother contends that in the transcript, the court did not orally recite any reasoning for the dispositional orders other than stating that it was "going to be

29.

continuing the placement orders for both of the children" nor did the court orally address the best interest factors considered or any reasonable efforts made by the agency.

{¶ 84} Mother maintains that the lack of any review of best interest factors, the lack of a finding of reasonable efforts, and the continued lack of evidence that the incident leading to the filed concerns had anything to do with an overdose or drug use, or that the incident formed any demonstrable threat of harm from the conditions or environment of the children, the dispositional orders should be reversed.

**The Agency's Arguments**

{¶ 85} The agency contends that its brief, the exhibits and the transcript demonstrate the threat of harm to the children by an overdosing mother, the sole parent in the household. The agency notes that R.H.'s father stated at the adjudicatory hearing, "Your Honor. That was really hard to watch on TV. I just want my daughter to be safe. I don't want her to be around stuff like that. She's told me a couple of times that she doesn't want to go to [B.G. and her husband R.G.'s] and see them."

**July 19, 2024 Judgment**

{¶ 86} This cause came to be heard on July 17, 2024, for a dispositional hearing.

. . .

Thereupon, the Court conducted a dispositional hearing and found that the [agency] made all reasonable efforts to finalize [R.M.] and [R.H.'s] permanency plan through the provision of supportive services.

It is hereby ordered, adjudged and decreed that the minor child herein, [R.M.], . . . be, and hereby is, placed in the temporary custody of her maternal aunt, [B.M.] . . . under the protective supervision of the [agency].

It is further ordered that the minor child herein, [R.H.], . . . be, and hereby is, placed in the temporary custody of her father, [C.H.] . . . under the protective supervision of the [agency].

It is further ordered that said children's mother is granted supervised visitation with said children at the [agency] or supervised by persons approved by the [agency] at locations approved by the [agency] as arranged between mother, temporary custodians and the [agency].

It is further ordered that [B.G.] and [R.G.] are not to be supervisors for mother's visitation with the children.
. . .

It is further ordered that said children are granted supervised visitation with [B.G.] and [R.G.], supervised by persons approved in advance by the [agency].

It is further ordered that said children are not to be at the residence of [R.G.] . . . until further order of the Court.

It is further ordered that said children's mother submit to a substance abuse assessment, actively participate in and successfully complete any recommended treatment and/or counseling and provide proof of completion to the Court within seven (7) days of completion.

It is further ordered that said children's mother submit to a mental health assessment, actively participate in and successfully complete any recommended treatment and/or counseling and provide proof of completion to the Court within seven (7) days of completion.

It is further ordered that said children's mother sign releases of information so that her progress in mental health counseling and substance abuse counseling can be shared with the [agency], the [GAL], and the Court.

It is further ordered that said children's mother submit to random substance abuse screens as requested by the [agency], the [GAL], or the Court within twenty-four (24) hours of said request.

It is further ordered that said children's mother obtain and maintain adequate housing sufficient for the needs of herself and said child.

It is further ordered that said children's mother obtain and maintain employment and/or use community resources sufficient for the needs of herself and said child.

It is further ordered that said children's mother only allow safe and sober individuals to have access to said children and her home.

It is further ordered that [R.H.] submit to a mental health assessment, actively participate in and successfully complete any recommended treatment and/or counseling and provide proof of completion to the Court within seven (7) days of completion.

It is further ordered that [R.H.'s] temporary custodian shall participate in said child's counseling if and when recommended by the medical provider.

It is further ordered that [R.H.'s] temporary custodian sign releases of information so that progress in mental health counseling can be shared with the [agency], the [GAL], and the Court.

. . .

**Standard of Review**

{¶ 87} Appellate courts review a dispositional order which awards, modifies or terminates legal custody for abuse of discretion. *In re T.J.*, 2010-Ohio-4191, ¶ 14 (10th Dist.). Moreover, appellate review of a trial court's decision regarding a parent's visitation rights in the context of a dependency action is for an abuse of discretion. *In re S.S.*, 2022-Ohio-520, ¶ 29 (8th Dist.).

{¶ 88} An abuse of discretion occurs when a trial court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A decision is unreasonable when there is no sound reasoning process which would support the decision. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*,

32.

50 Ohio St.3d 157, 161 (1990).  A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances."  *Black's Law Dictionary* (12th Ed. 2024).  A decision is unconscionable if it is "shockingly unjust or unfair."  *Id.*

**Law**

{¶ 89} A noncustodial parent in a dependency action retains residual parental rights and responsibilities, which includes "the privilege of reasonable visitation."  R.C. 2151.011(B)(50) and R.C. 2151.353(A)(3)(c).  The focus of a visitation order is the best interest of the child, thus the trial court has discretion to "restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child." *Anderson v. Anderson*, 2002-Ohio-1156, ¶ 18 (7th Dist.), quoting *Jannetti v. Nichol*, 2000 WL 652540, *3 (7th Dist. May 12, 2000).

{¶ 90} "There does not appear to be any definitive test or set of criteria to apply in determining the best interest of a child in parental custody proceedings incident to a dependency action.  Thus, . . . the juvenile courts should consider the totality of the circumstances, including, to the extent they are applicable, those factors set forth in R.C. 3109.04(F)." *Matter of Knisley*, 1998 WL 372703, *2 (4th Dist. May 26, 1998). "Likewise, there does not appear to be any definitive test or set of criteria to apply in determining whether, and/or on what terms, to grant visitation rights to the non-custodial parent in parental custody proceedings incident to a dependency action. . . [W]hen making a disposition in a dependency proceeding under R.C. 2151.353(A)(3), the

33.

juvenile court should consider the issue of visitation under the totality of the circumstances . . ." *Id. See also In re C.H.*, 2011-Ohio-1386, ¶ 12-13 (10th Dist.).

**Analysis**

{¶ 91} Upon review, in the trial court's judgment following the dispositional hearing, the court approved the agency's case plan, continued the children's placement orders, and continued mother's supervised contact with the children, as the court was satisfied that the existing orders were "certainly in the best interest of the children." The court remained of the opinion that the children were dependent, and that did not change based on what the court heard and saw at the adjudicatory hearing. The court further noted that substance abuse was a concern.

{¶ 92} Based upon the facts and circumstances of this case, as summarized above, and the applicable law, we cannot find that the trial court's order to allow mother only supervised contact with the children was arbitrary, unreasonable or unconscionable. Evidence was presented that while mother's children were in the house, mother was found unconscious, along with her sister-in-law, near suspected drug paraphernalia and drugs. Both women were revived with Narcan, which works for opioid overdoses, and then hospitalized. Yet, mother refused to acknowledge that she took drugs or overdosed. This failure to take accountability for her conduct poses a legitimate risk of harm to her children. Evidence was also presented that R.H. was very comfortable and happy in her father's care and did not want anything to change except she wanted to see her sister more.

34.

{¶ 93} The court stated the existing orders were "certainly in the best interest of the children," including mother having only supervised contact with the children. Although the trial court did not specifically state what best interest factors it considered, the court was not required to do so.

{¶ 94} In light of the foregoing, we find mother's third assignment of error not well-taken.

{¶ 95} The May 8, 2024, July 16, 2024, July 19, 2024 and August 29, 2025 judgments of the Huron County Court of Common Pleas, Juvenile Division are affirmed.

{¶ 96} Mother to pay the costs of appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| Thomas J. Osowik, P.J. | |
|---|---|
| | JUDGE |
| Christine E. Mayle, J. | |
| | JUDGE |
| Myron C. Duhart, J. | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.