[Cite as *In re T.A.*, 2024-Ohio-5139.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

In re T.A., Jr.

Court of Appeals No. WD-24-011

Trial Court No. 2022 JZ 0062

## DECISION AND JUDGMENT

Decided: October 25, 2024

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Wesley R. True, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, K.F., appeals the January 22, 2024 judgment of the Wood County Court of Common Pleas, Juvenile Division, denying her motion for legal custody of her minor son, T.A., to be awarded to his great-aunt, C.B., and granting appellee Wood County Department of Job and Family Services' (WCDJFS) motion for legal custody of the child to his foster parents. For the reasons that follow, the juvenile court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} K.F., is the mother and T.A., Sr., is the father of T.A., born in May 2020. On January 25, 2022, WCDJFS filed a complaint alleging T.A. was an abused child. WCDJFS maintained that the family, including T.A.'s half-brother, Q.G., lived at a motel and the parents smoked marijuana in the room allowing the children to get "contact buzzed" because it helped with their seizures. T.A. tested positive for THC. The agency alleged that mother does not take the children out of the room due to their weak immune systems and that she does not dress them if they are not going out because it costs money to wash clothes. It further alleged that on January 24, 2022, Father had a "mental breakdown" in the room; he threw things and broke the television. Father kicked a container hitting Q.G. on the ankle. Mother and Q.G. fled the room and ran to the motel office where she called police. T.A. was asleep in the room.

{¶ 3} WCDJFS requested emergency temporary custody of T.A. The juvenile court granted the motion and ordered that T.A. be placed in foster care. Half-sibling, Q.G. was also removed from the home and placed in the same foster home. A relative was awarded custody of Q.G. and he moved to North Carolina.

{¶ 4} By agreement of the parties, WCDJFS amended its complaint to allege that T.A. was a neglected child. On March 22, 2022, the juvenile court adjudicated T.A. a neglected child. Temporary custody remained with WCDJFS.

{¶ 5} On April 13, 2023, WCDJFS filed a motion for permanent custody of T.A, stating that mother and father failed to comply with their case plans, they lacked financial

2.

stability and stable housing, and had been inconsistent with visitations. WCDJFS also maintained that it had been unable to locate a suitable relative placement.

{¶ 6} WCDJFS withdrew its motion after initiating the Interstate Compact on the Placement of Children (ICPC) process for an out-of-state home study of T.A.'s maternal great-aunt, C.B., in the state of Washington, and a relative in North Carolina.

{¶ 7} A second permanent custody motion was filed on September 26, 2023. The motion stated that T.A. had been in the temporary custody of WCDJFS since January 2022, and it was not able to find an appropriate relative placement.

{¶ 8} On December 11, 2023, mother filed a motion requesting that legal custody be granted to great-aunt who had an approved home study. The juvenile court granted the motion, in part, allowing great-aunt to appear at the permanent custody hearing as a witness for possible placement.

{¶ 9} WCDJFS subsequently filed a motion for alternative disposition, withdrawing its request for permanent custody and requesting that T.A.'s foster parents be granted legal custody. On January 8, 2024, the foster parents filed a signed affidavit affirming their intention to become T.A.'s legal custodians.

{¶ 10} The dispositional hearing on the motions for legal custody commenced on January 9, 2024. The caseworker testified that her involvement with the family began on January 24, 2022, when T.A. was removed from his parents' custody. She testified that the parents' mental health and substance abuse issues caused T.A.'s removal. T.A. was

3.

placed with foster parents J.H. and A.H. where he currently resides. The caseworker stated that parents have not completed the case plan services and lack stable housing.

{¶ 11} The caseworker stated that mother is living in North Carolina and inconsistently attends virtual visitations. In June 2023, father returned to Ohio from North Carlonia and has been consistent with weekly, in-person supervised visitation.

{¶ 12} The caseworker testified that T.A. and his foster family are very bonded and he refers to them as mom and dad. Early in the case, T.A.'s half-brother was also residing in the foster home but now resides with his paternal cousin in North Carolina.

{¶ 13} The caseworker stated that in January 2022, the agency began looking at relative placement for T.A. On March 17, 2022, the agency and T.A.'s maternal great-aunt living in Washington, made contact. The great-aunt initially stated that she was not able to care for T.A. because his maternal grandmother lived with great-aunt and she had severe mental health issues and should not be around children. In April 2023, however, she informed the caseworker that she was interested in taking placement of T.A. In May 2023, the agency submitted a request for a home study.

{¶ 14} In late June 2023, the caseworker received a phone call from the individual conducting the home study expressing concerns regarding great-aunt's long-term boyfriend who lived in the home. The caseworker stated that the boyfriend could not be approved for adoptive placement because he was still married to his estranged wife. There were also concerns regarding great-aunt's substance abuse. She had a 16-year crack cocaine addiction but had not used since 2010. In 2022, great-aunt abused alcohol

4.

on a daily basis; she quit on her own. Finally, the ICPC worker noted great-aunt's perceived lack of concern regarding T.A.'s potential exposure to several relatives struggling with severe mental health and substance abuse issues, criminal histories, and homelessness. On November 7, 2023, great-aunt's home study was approved following her completion of 12 outpatient substance-abuse sessions. Due to a processing error, WCDJFS did not receive the official report until December 2023.

{¶ 15} The caseworker stated that great-aunt and T.A. had no relationship prior to his placement in foster care and that they had two virtual visits. The caseworker stated that she believed that it was in T.A.'s best interest to remain with his foster parents with whom he has a very strong bond and attachment. She explained that T.A. is sensitive and needs strong emotional supports which his foster parents provide. The caseworker testified her belief that the foster parents would continue to facilitate visitation with T.A.'s parents.

{¶ 16} The caseworker stated that in April and May 2023, she and great-aunt had four short telephone calls presumably regarding the home study, an e-mail exchange in May, and a telephone call in August. After the home study was approved, they connected to arrange virtual visitation.

{¶ 17} The caseworker agreed that her concerns regarding great-aunt were addressed during the home study. She also acknowledged that great-aunt put T.A.'s safety first when she initially stated that she could not care for him because her sister lived in her home. The caseworker further acknowledged that following the removal of a

5.

child, reunification with the parents is the first goal and that relative placement is the second-best option.

{¶ 18} During the proceedings, the court assigned T.A. two consecutive court-appointed special advocates (CASA). Mike G. testified that he was T.A.'s CASA from February 2022 until August 2023. Mike stated that he saw T.A. a minimum of once a month. During the last six to eight months of his tenure, Mike noticed a strong bond between T.A. and his foster parents. He stated that the foster parents provided "great" support and structure, including assigning him simple household chores and providing options when redirecting inappropriate behaviors. Mike felt that reasonable, age-appropriate expectations were placed on T.A.

{¶ 19} Mike testified that he never spoke directly to great-aunt, but they exchanged e-mails. He noted that great-aunt promptly responded to his questions. Great-aunt explained that she was unable to take T.A. earlier in the case because his grandmother was living with her and she felt he should not be around her. Mike agreed that at face value, it was a reasonable explanation. Great-aunt further indicated that she wanted custody of T.A. so he could get to know many of his family members. She believed that she could provide a good and permanent home. Mike admitted that he was not aware of anything that happened after August 2023, due to his resignation from the CASA program.

{¶ 20} Foster father, J.H., testified that WCDJFS placed T.A. in their home in January 2022. On a typical day, after eating breakfast and dropping off his foster sister at

6.

school, T.A. and foster mother do chores and often have a reading lesson. After lunch T.A. naps in his own room. Foster parents focus on activities they can do together as a family. Foster father stated that T.A. was ready to start preschool.

{¶ 21} Foster father testified that video visitation with mother has been inconsistent. Father has one weekly, in-person visitation. Foster father acknowledged an understanding that if he and his wife were awarded legal custody of T.A., his biological parents will have residual rights which includes visitation. He testified that T.A. has a good relationship with his extended foster family.

{¶ 22} As to T.A.'s African American heritage, foster father testified that there are multi-racial families at their church, they have pursued "culturally appropriate" hairstyles for T.A. and have learned to maintain them, and they are interested in exploring his heritage further.

{¶ 23} WCDJFS supervisor, Kristin Weymer, testified that she supervised the caseworker assigned to T.A and his family. Weymer was questioned about agency visitation policies; she stated that though not a written rule, caseworkers would initially speak with her prior to adding a new person to the visitation schedule. Weymer said the Washington ICPC worker's concerns delayed approving great-aunt's visitation with T.A.

{¶ 24} Weymer explained that despite her preference for relative placement, it would be traumatic to remove T.A. from his foster placement of two years. Weymer acknowledged that T.A. has already experienced trauma; she could not speculate whether

7.

he would suffer any future trauma from not being raised by a biological relative. Weymer admitted she had no concerns about great-aunt's ability to care for T.A.

{¶ 25} Wood County CASA director Kristen L. testified that following her August 2023 appointment as T.A.'s CASA, she met with him once monthly. Kristen stated that she believed that legal custody of T.A. should be awarded to great-aunt for both biological and cultural reasons. Kristen acknowledged that her opinion differed from the original CASA because she had the completed home study, had spoken with great-aunt, and learned that both parents wished that great-aunt be awarded legal custody.

{¶ 26} Kristen expressed no concerns regarding T.A.'s ability to form a bond with great-aunt; her concern was that his foster parents would not maintain familial and cultural connections and that based on T.A.'s young age, they were unrealistically strict and regimented.

{¶ 27} Kristen acknowledged a discrepancy in the number of individuals living in great-aunt's home between the date of the approved home study (three) and currently (five). Kristen acknowledged that great-aunt had expressed a long-term goal to move from Washington to North Carolina which would result in another adjustment for T.A.

{¶ 28} Kristen agreed that T.A. had a strong bond or attachment to his foster parents. She also agreed that as recently as one month prior to the hearing, father had no preference for either placement and expressed that he and the foster parents have a good connection.

8.

{¶ 29} Prior to the hearing, great-aunt had not submitted the required R.C. 2151.353(A)(3) affidavit or statement of understanding prior to an award of legal custody. She answered a series of questions presumably to satisfy the requirement through testimony.

{¶ 30} Great-aunt testified that she has resided in Washington since 2014. She stated that she has a three-bedroom townhome and that once her grandson moves out in June 2024, T.A. would have his own room. She completed the home study's recommended substance abuse treatment. Great-aunt stated that she has been drug-free for 14 years. She agreed that she plans to move to North Carolina where most of T.A.'s family is located.

{¶ 31} Great-aunt stated that early in the case she was unable to take custody of T.A. because her sister, T.A.'s grandmother, who lost custody of all four of her children, was living in the home and it was not an appropriate environment. After her sister moved out in February 2023, she contacted WCDJFS about gaining custody of T.A. Great-aunt had two virtual visitations the week leading up to the hearing; the first visitation was her first time meeting T.A.

{¶ 32} Great-aunt agreed that if she gained custody of T.A. she would foster a relationship with his parents and half siblings, she would make sure his medical needs are met, she would help him adjust to her home and school when age-appropriate, and she would remain in Washington if moving to North Carolina was not in T.A.'s best interest.

9.

{¶ 33} During her closing argument, T.A.'s court-appointed attorney recommended that he be placed with great-aunt. She expressed concern regarding WCDJFS' delay in scheduling visitation between T.A. and great-aunt.

{¶ 34} On January 22, 2024, the juvenile court awarded WCDJFS' motion for legal custody of T.A. to be awarded to his foster parents and denied mother's motion requesting that great-aunt be awarded legal custody.

{¶ 35} In its analysis, the court set forth the preference under Ohio law for child placement with a nonparent relative but noted that the mere fact that a nonparent relative is a party in a custody matter is not outcome determinative. The court acknowledged both parents' desire for T.A. to be placed with great-aunt though father, up until a week before the hearing, seemed to favor the foster parents because he had a good relationship with them, and that the caseworker testified her belief that the foster family should be awarded legal custody of T.A. The court noted that the first and second CASAs had different opinions regarding T.A.'s placement.

{¶ 36} The juvenile court concluded that WCDJFS made reasonable efforts to eliminate the need for T.A.'s removal from his home and for relative placement. It found that T.A. had been with his fosters parents for over two years, is very bonded with them, and is fully integrated into their home. It noted that allowing T.A. to stay with his foster family is the only option which would maintain in-person visitation with father. The court observed that T.A.'s foster parents were intent on reinforcing T.A.'s cultural and family traditions. The court emphasized T.A.'s need for stability. It concluded that the

10.

preponderance of the evidence supported awarding WCDJFS' motion. The court awarded the parents supervised visitation. Father's visitation was continued as supervised in-person visitation for a minimum of two hours weekly. Mother's visitation with T.A. would be "as agreed to."

{¶ 37} This appeal followed.

## II. Assignments of Error

{¶ 38} Mother raises the following two assignments of error:

> I. The trial court abused its discretion when it denied mother's Motion for Custody, which was arguably a request for third party custody to maternal aunt who was available, interested, and had an approved home study.
> II. In the alternative, the trial court's decision to award supervised parenting time to mother "as agreed to" is arguably not based on competent, credible evidence, and is not in the best interest of the children.

## III. Analysis

## A. Legal Custody

{¶ 39} Under mother's first assignment of error, she challenges the juvenile court's denial of her motion requesting that legal custody of T.A. be awarded great-aunt. Mother cites the Kinship Caregiver Act, R.C. 2151.4115-2151.4122, codifying the requirement that a public children services agency "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child" in temporary custody of the agency. A kinship caregiver is relevantly defined as "[a]unts … with the prefix 'great'" and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure

the child's social ties." R.C. 2151.4115(A)(1), adopting the kinship caregiver definitions in R.C. 5101.85.

**{¶ 40}** A legal custody determination is reviewed for an abuse of discretion. *Blausey v. Blausey*, 2019-Ohio-4506, ¶ 13 (6th Dist.), citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶ 41}** Under R.C. 2151.353(A)(3), a juvenile court may award legal custody of any child to any person who files a motion seeking legal custody. "In order to grant legal custody of a dependent child to a nonparent, the trial court must find, by a preponderance of the evidence that legal custody is in the child's best interest." *In re Am.H.*, 2019-Ohio-4374, ¶ 36 (6th Dist.), citing *In re Christopher M.*, 2007-Ohio-1040, ¶ 12 (6th Dist.); *In re A.B.*, 2020-Ohio-3990, ¶ 15 (6th Dist.). "In making such a determination 'courts have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), a combination of the two, or general notions of what should be considered regarding the best interests of the [child].'" *In re A.D.*, 2017-Ohio-6913, ¶ 32 (6th Dist.), quoting *In re A.K.*, 2012-Ohio-4430, ¶ 25 (9th Dist.); *see In re J.D.*, 2024-Ohio-1443, ¶ 18 (6th Dist.).

**{¶ 42}** Granting WCDJFS' motion, the juvenile court stated that it relied on the best interest factors in R.C. 3109.04(F) and any other pertinent factors. R.C. 3109.04(F) relevantly provides:

> (F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and

12.

responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

{¶ 43} Here, mother argues that the juvenile court failed to consider great-aunt's proactiveness in contacting WCDJFS, her honesty regarding past substance abuse issues, the recommendation of T.A.'s second CASA, and the need for a familial and cultural connection. In its 40-page decision, the court thoroughly summarized the evidence presented. The juvenile court acknowledged, and found laudable, great-aunt's willingness to provide for T.A. but noted instability in her home, specifically the fact that she has any number of grandchildren living with her at various times and has issues with extended family. The court noted that the T.A.'s current living situation is the only option allowing father to have in-person visitation. The court stated that foster parents are sensitive to and willing to facilitate T.A.'s need to explore his heritage and culture. The court stressed the fact that T.A. has been in his foster home for two years, considered a "kinship placement," and is bonded with the immediate and extended family.

13.

**{¶ 44}** Upon due consideration, the juvenile court's decision finding by a preponderance of the evidence that an award of legal custody to T.A.'s foster parents was in his best interest is neither arbitrary, unreasonable, or unconscionable and, thus, not an abuse of discretion. Mother's first assignment of error is not well-taken.

### B. Visitation

**{¶ 45}** Mother's second assignment of error challenges the court's visitation award of supervised contact with T.A. "as agreed to." Mother argues that father's more specific award of "a minimum or two years each week" is a "reasonable starting point" for mother's visitation.

**{¶ 46}** A trial court's visitation order is reviewed under an abuse of discretion standard. *In re C.T.*, 2019-Ohio-3403, ¶ 8 (6th Dist.), citing *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989). The main focus of a visitation order is the best interest of the child. *Id.* at ¶ 9, quoting *In re F.B.*, 2018-Ohio-2488, ¶ 18 (12th Dist.). The trial court is able to "'restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child.'" *Id.*, quoting *Jannetti v. Nichol*, 2000 WL 652540, *3 (7th Dist. May 12, 2000).

**{¶ 47}** The record evidences mother's inconsistent virtual visitations. This fact, combined with T.A.'s young age, supports the finding that the juvenile court did not abuse its discretion in awarding an arguably more limited virtual visitation schedule. Mother's second assignment of error is not well-taken.

14.

## IV. Conclusion

**{¶ 48}** For the foregoing reasons, the January 22, 2024 judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed.  K.F. is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                    _____
                                                                    JUDGE

Myron C. Duhart, J.

Charles E. Sulek, P.J.                   _____
CONCUR.                                                       JUDGE

                                                         _____
                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.