[Cite as *In re T.L.*, 2026-Ohio-2118.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re T.L.

Court of Appeals No.  H-25-015

Trial Court No.  DNA 2023 00114

**DECISION AND JUDGMENT**

Decided: June 5, 2026

* * * * *

Richard Palau, for appellee.

Anthony J. Richardson, II, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal filed by appellant, T.L. ("father"), from the June 3, 2025 judgment of the Huron County Court of Common Pleas, Juvenile Division.  For the reasons that follow, we affirm the trial court's judgment.

{¶ 2} Father sets forth one assignment of error:

The trial court committed reversible error by not specifying an amount of time or granting meaningful visitation when mother will not comply with the vauge [sic] order.

**Background**

{¶ 3} Father and S.D. ("mother") have a child together, T.E.L. ("the child"), who was born in November 2022.  Mother and father never married each other.

{¶ 4} In October 2023, father was driving a vehicle with mother and father's brother as passengers when police pulled over the car. Father and his brother were arrested on outstanding warrants. Methamphetamine was found in mother's purse and she was arrested.

{¶ 5} On October 26, 2023, the agency filed a complaint in the trial court alleging the child was dependent, pursuant to R.C. 2151.04(C). In the complaint, another man was identified as the child's biological father, but following genetic testing, he was excluded. Father was subsequently found to be the child's biological father.

{¶ 6} A shelter care hearing was held on October 27, 2023. The child was placed in the temporary custody of a maternal aunt ("aunt"), with protective supervision by the agency. Mother was granted supervised visits. A guardian ad litem ("GAL") was appointed for the child.

{¶ 7} On November 28, 2023, the family case plan was filed which did not include father.

{¶ 8} On December 11, 2023, the adjudicatory hearing was held, and the court adjudicated the child to be a dependent child, as alleged in the complaint.

{¶ 9} On December 29, 2023, father filed a motion for legal custody in which he alleged that, depending on DNA, he is a willing parent, and he has "provided" since the child's birth.

{¶ 10} On January 17, 2024, the dispositional hearing was held and the court found that the agency made all reasonable efforts to finalize the child's permanency plan through supportive services. The child was placed in the aunt's temporary custody, under 2.

the agency's protective supervision. Mother was granted supervised visits. The court approved of the November 28, 2023 case plan.

{¶ 11} In early February 2024, the agency issued an order that father was the child's biological father.

{¶ 12} On April 2, 2024, father was added to the family case plan. Thereafter, a further dispositional hearing was held. The court placed the child in mother's temporary custody under the agency's protective supervision. Father was granted supervised visits. The court approved the April 2, 2024 case plan.

{¶ 13} On June 26, 2024, mother filed a motion for legal custody of the child.

{¶ 14} On July 17, 2024, a further shelter care hearing was held. The child was placed in the temporary custody of maternal grandmother ("grandmother"), with whom mother and the child lived, under the agency's protective supervision. Mother was allowed supervised contact with the child and father was granted supervised visits.

{¶ 15} On July 29, 2024, an amended case plan was filed which, inter alia, added grandmother. The court approved this case plan on August 9, 2024.

{¶ 16} On October 17, 2024, an amended case plan was filed which eliminated father from the case plan. The court approved this case plan on October 24, 2024.

{¶ 17} On March 4, 2025, the court held a hearing. The court placed the child in the temporary custody of mother under the protective supervision of the agency. Father was granted supervised visits.

{¶ 18} On April 1, 2025, an amended case plan was filed which eliminated grandmother from the case plan. The court approved this case plan on April 8, 2025

3.

{¶ 19} On June 2, 2025, a trial was held on the competing motions for legal custody of the child.  On June 3, 2025, the court issued a judgment entry placing the child in the legal custody of mother and granting father supervised visits with the child.

{¶ 20} Father appealed.  Mother did not participate in this appeal.

## June 2, 2025 Trial on Motions for Legal Custody

{¶ 21} The trial was attended by, inter alia, counsel, father, mother, the GAL and the caseworker.  Both parents, the caseworker, and the GAL testified.  Their relevant testimony is summarized below.

**Caseworker**

{¶ 22} Jody Moen, an agency ongoing caseworker, testified to the following.  She worked with the family since December 2023.

{¶ 23} Mother's case plan included: mental health as well as and drug and alcohol assessments, following through with recommended treatment and attend counseling; drug screens; parenting; housing; employment; cooperating with announced and unannounced home visits; and sign releases.  She successfully completed all of her case plan services.

{¶ 24} Father's case plan goals consisted of: mental health and drug and alcohol assessments; following through with recommended treatment and counseling; drug screens; housing; employment; cooperating with announced and unannounced home visits; completing parenting classes; and signing releases.  He did not complete any case plan services.

{¶ 25} Moen was never able to meet with father although she attempted to see him at his residence at least three times a month.  She said he was uncooperative.  She also

4.

made phone calls to father, but she was not able to find him. Father never contacted Moen. Moen testified that it is typical to remove a parent from a case plan if the parent is noncooperative for several months, like father.

{¶ 26} Moen recommended that mother have legal custody of the child and father have supervised visits.

**Father**

{¶ 27} Father testified that he is currently employed, rents a room in a house from a nice older lady and has transportation - any time that he needs a ride, he just asks and he "get[s] a ride where [he] need[s] to go, any day." Later, he said transportation kept him from engaging with the agency. He believes the house where he has been staying since February 2025 would pass a safety inspection for purposes of the child being there with him. He said he left a message reporting his current employer to child support, but he "d[id]n't know if they go it or not."

{¶ 28} Father was arrested in October 2023 for a child support warrant. Prior to that, he had served time in jail, other than for child support, for a "bunch of misdemeanor stuff, past tense."

{¶ 29} Father said that during the case it was hard to contact him because "[i]f it's my mail, it's probably through mailing because the mail bounces around, get mail late. If it's the phone, I just had a new contract, probably within the last six months. And the voicemail is not working, but it states it's working." However, father said his previous phone worked, and he got all of his messages. Later, father said he was not working with the agency because he did not have a phone.

5.

**{¶ 30}** Father said the agency never told him it had evidence that he had mental health or substance abuse issues that he needed to treat, but he said that last year, he went and got evaluated. He was supposed to do drug and alcohol counseling, but he did not do it. He was never charged with serious domestic violence or assault, so he was surprised that was in the case plan. He never received a drug screen and he never refused to sign a release. He just found out that he was removed from the case plan; he did not ask to be removed.

**{¶ 31}** Regarding visits with the child, father "started visitations up last year, [but he] got called off sick because [he] was real sick. And [the agency] just stopped the visitations." Father's mother died in June 2024, and for about eight months before her death, he and his sister cared for their mother, so father was unable to work because that took up almost all of his time. He said that was another reason that the agency "canceled out the visitations." He also said mother canceled a few visits or refused to bring the child to visits. He had one visit "since [he] started it back up a month ago," but after that, he missed a visit because he was working "[a]nd [he] never did call." Father has always wanted visitation time with the child, as much as he is able.

**{¶ 32}** Father wanted the court to know about his personal situation in the last six months to a year that "besides [his] mother passing, [his] own issues, bouncing around from [his] sister-in-law's to where [his is] staying now, [he] lost [his] life five months ago, hypothermia. When [he] called to set up something to reschedule it, [he] never got the answer, you know, the messages or paperwork, because mail was bouncing around." In the year before February 2025, he lived in several different locations out of necessity.

6.

**{¶ 33}** Regarding work, at the time of trial father worked at a pallet place - initially he said since January of 2025, later he said he worked there only about four weeks. Before that, he said he worked in construction and held automotive jobs where he was drug-tested. He said he never failed a drug test.

**{¶ 34}** Father has a total of five children, including the child. He has visitation orders for supervised visits with his four other children, but he has not seen them for a while and could not remember when he last saw them. He said he has not been allowed to see two of his children because of nonpayment of child support.

**GAL**

**{¶ 35}** Carrie Kimmet, the child's GAL, testified that she has been on the case since the beginning. She was familiar with father as she was the GAL on two other cases for father's other four children. Father visited regularly with only his two older children until there were concerns with his substance abuse. She knew of father's substance abuse issues, as he was pulled over several times by the highway patrol and drugs were found in the car. She also was aware that father had at least two OVI convictions.

**{¶ 36}** Kimmet recalled that father had a history of not completing case plans and not being cooperative with the agency.

**{¶ 37}** Kimmet's recommendations were the same as the agency's: for mother to have legal custody of the child and father to have supervised visits. With respect to the child's best interest, Kimmet's concern was that she did not think that the child knows father because father only visited one time with the child in the past year. Kimmet would

7.

like to see consistent visitation which would allow them to establish a healthy relationship; at least one visit per month.

**Mother**

{¶ 38} Mother testified that she has been sober since July 2024.  She does not agree with the agency and GAL's recommendations that father have supervised visits with the child. Father has not been drug-tested and has done no case plan services, so mother did not feel that the child would be safe with father.  Mother admitted that she did not follow the court's order already in place for visitation, as she did not feel like the child was going to be safe, even at a supervised visit, with father.

**June 3, 2025 Judgment Entry**

{¶ 39} The trial court found that legal custody of the child to mother would be in the child's best interest and that father was to receive at least one supervised visit a month with the child.

{¶ 40} The court found, regarding father, that "[a]lthough [he] claims to have completed an assessment, the agency has not verified this claim, and he did not offer any verification as evidence at trial.  There is no evidence that he completed parenting instruction.  He also has not submitted to drug screens requested by [the agency] . . . [and] never signed a release to enable the agency to verify his claims that an assessment had been completed."

{¶ 41} The court noted that father "has worked with his current employer . . . for about 4 weeks.  He lives with an 'older woman' who 'took him in[.]' . . . Although he lacks a vehicle of his own, he claims to have reliable transportation to all of his

8.

appointments and is able to get to and from his job each day. He explains his lack of visits on a variety of factors: being his now deceased mother's caregiver (she passed away in July, 2024); lack of transportation (although he claims to have reliable transportation for other purposes, including his employment); and cancellations of his visits by others. He blames his lack of communication with the agency on problems with his phone."

{¶ 42} The court further observed that father has four other minor children and has little to no contact with any of them. He has been incarcerated more than once for child support contempt. Concerning father and the child, the court found that father "has been elusive, absent and not engaged . . . [and] exercised supervised visitation with [the child] on 3 or 4 occasions in 2024 and only once thus far in 2025[.]"

{¶ 43} The court determined "it would be in [the child's] best interest to be placed in the legal custody of her mother [who] has demonstrated consistent and appropriate parenting with the child and has been open and transparent with the agency as she addressed, one by one, her various case plan objectives." The court further decided that "it would also be in [the child's] best interest to have supervised visitation with her father in a location where objective supervisors would be in place to monitor the interaction between father and child. [Father] has been inexplicably aloof from this case and his daughter's life. He has appeared for a majority, but not all, of the scheduled hearings, but has simply not followed through with observing his case plan requirements and engaging with [the agency]." The court qualified its decision by setting forth that "[i]f [father] develops a consistent pattern of healthy and meaningful supervised visits, the Court

9.

would certainly envision an enlargement of his time with [the child] in the future. He will have an opportunity to demonstrate his commitment and consistency[.]"

**Assignment of Error**

{¶ 44} Father argues his parental rights are hindered as he is not allowed meaningful visitation with the child. He asserts that his and the child's due process rights to be a family are violated, and it is against the child's best interest.

{¶ 45} Father observes that on June 3, 2025, the trial court granted legal custody of the child to mother and terminated the agency's protective supervision. Father concedes it is in the child's best interest, who is a two-year old toddler, to be in the mother's legal custody, but he challenges the trial court's vague order as being against the child's best interest. He contends that he and the child should have a meaningful opportunity to build and maintain a relationship with consistent and frequent visits, but this will not happen unless mother is ordered to do so because she does not want to facilitate visits at all.

{¶ 46} Father notes the GAL and social worker both testified that the child would benefit from meaningful visitation with father, yet the trial court only mandated that he have supervised visits once per month. Father argues that order does not specify an amount of time for the monthly visit and "at least once" really means one visit because mother does not want to help father or the court facilitate a relationship between the child and father.

10.

{¶ 47} Father submits that mother testified that she did not comply with the trial court's past order regarding visits "[b]ecause he hasn't done no Case Plan" and she felt the child would not be safe with father.

**Legal Custody/Visitation/Best Interest**

**Law**

{¶ 48} R.C. 2151.353(A)(3) provides that "[i]f a child is adjudicated a[] . . . dependent child, the court may make any of the following orders of disposition [including] . . . [an] [a]ward legal custody of the child to either parent[.]"

{¶ 49} R.C. 2151.011(B)(21) defines legal custody as "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities."  Residual parental rights include "the privilege of reasonable visitation[.]"  R.C. 2151.011(B)(50).

{¶ 50} "The focus of a visitation order is the best interest[s] of the child, thus the trial court has discretion to 'restrict the time and place of visitation, to determine the conditions under which visitation will take place and to deny visitation rights altogether if visitation would not be in the best interests of the child.' *Anderson v. Anderson*, 2002-Ohio-1156, ¶ 18 (7th Dist.), quoting *Jannetti v. Nichol*, 2000 WL 652540, *3 (7th Dist. May 12, 2000)."  *In re R.M.*, 2026-Ohio-1591, ¶ 89 (6th Dist.).

{¶ 51} In making a determination of what is in the child's best interest, juvenile courts "have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), 11.

a combination of the two, or general notions of what should be considered regarding the best interests of the [child]." *In re A.D.*, 2017-Ohio-6913, ¶ 32 (6th Dist.), quoting *In re A.K.*, 2012-Ohio-4430, ¶ 25 (9th Dist.).  Some of those factors are "[t]he child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;" "[t]he wishes of the child, as expressed . . . through the child's [GAL], with due regard for the maturity of the child;" "[t]he child's adjustment to the child's home, school, and community;" "[t]he mental and physical health of all persons involved in the situation;" and "[t]he parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights."  R.C. 3109.04(F)(1) and R.C. 2151.414(D)(1)(a).

**Standard of Review - Visitation Order**

{¶ 52} A trial court's visitation order is reviewed under an abuse of discretion standard. *In re T.A.*, 2024-Ohio-5139, ¶ 46 (6th Dist.), citing, inter alia, *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989).  A trial court abuses its discretion when it issues a judgment that is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  The main focus of any visitation order is the child's best interest.  *In re T.A.* at ¶ 46.  Thus, a trial court may restrict the time, place and conditions of visitation or deny visitation altogether if visits would not be in the child's best interest. *Id.*

**Analysis**

{¶ 53} Upon review, the record indicates that father's visits with the child have been inconsistent, as he has only seen her five times in two years.  We find that this

12.

concerning fact, as well as the child's young age and father's failure to communicate with the agency or comply with case plan services are sound reasons for the order of supervised visitation at least once a month, with father having the chance for additional visits with the child. The record shows that the court considered numerous factors and decided it was in the child's best interest for father to have limited, supervised visits while also allowing father the chance to address and remedy his issues so that he could potentially increase the amount of visits with the child. As such, we find that the trial court's visitation order is not unreasonable, arbitrary, or unconscionable. Therefore, we find that the trial court did not abuse its discretion in awarding father limited, supervised visitation with the child.

## Substantive Due Process

**Law**

{¶ 54} "The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The United States Supreme Court has "long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Id.*, citing *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel* at 65, citing *Glucksberg* at 720.

{¶ 55} When a party argues that a government regulation impinges upon a fundamental constitutional right, courts must apply a strict scrutiny standard of review.

13.

*Harrold v. Collier*, 2005-Ohio-5334, ¶ 39. Under that standard, a regulation which infringes on a fundamental right is unconstitutional unless the regulation is narrowly tailored to promote a compelling governmental interest. *Id.*, citing *Chavez v. Martinez*, 538 U.S. 760, 775 (2003).

{¶ 56} The liberty interest of parents as to the care, custody and management of their children is maybe the oldest of the fundamental liberty interests recognized by the United States Supreme Court. *Troxel* at 65. The Supreme Court, in *Troxel* at 65-66, explained:

> More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 . . . (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 . . . (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535 . . . We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158 . . . (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166[.]

{¶ 57} Thus, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel* at 66; *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

14.

## Analysis

**{¶ 58}** Father claims the trial court's visitation order is a violation of his and the child's due process rights, and he claims the order is vague so as to deny due process. Based upon the applicable law, we must apply the strict-scrutiny standard to father's claims to determine if the visitation order is narrowly tailored to promote a compelling government interest. *See Harrold* at ¶ 39. Promoting the best interests of children is a compelling government interest. *Id.* at ¶ 44.

**{¶ 59}** Upon review, we find the visitation order is narrowly tailored to promote the compelling governmental interest of assuring that the child's best interest is observed while allocating father's parental rights and responsibilities. Furthermore, we find the visitation order is not vague, so as to deny due process. In its judgment entry, the trial court plainly set forth that father would have at least one supervised visit with the child per month. The court then clearly indicated that once father "develops a consistent pattern of healthy and meaningful supervised visits, the Court would certainly envision an enlargement of his time with [the child] in the future. He will have an opportunity to demonstrate his commitment and consistency at Kinship House." We find that the trial court's condition that father develop "a consistent pattern of healthy and meaningful supervised visits" with the child, sets a low threshold for reconsideration of father's parenting time, as he must simply prove his desire to be involved in the child's life. Thus, we find that this condition seeks to implement visits between father and the child in a manner which accommodates both father's fundamental right for the care, custody and management of the child, and the child's best interest.

15.

**{¶ 60}** Lastly, we find father's argument that the visitation order gives mother sole control over his visits with the child is without merit. The trial court ordered that father have at least one supervised visit a month with the child, and father merely speculates that mother will not follow the court order. Notwithstanding, if father pursues visits with the child and mother refuses to follow the visitation order by not making the child available, he may move the trial court for additional orders relating to visitation time with the child, or he can file a motion with the trial court to hold mother in contempt.

**{¶ 61}** We therefore conclude that father and the child's due process rights were not violated by the trial court's visitation order.

**{¶ 62}** Accordingly, father's sole assignment of error is not well taken.

### Conclusion

**{¶ 63}** The judgment of the Huron County Common Pleas Court, Juvenile Division, is affirmed. Pursuant to App.R. 24, father is hereby ordered to pay the costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.
_____
JUDGE

Christine E. Mayle, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.